**James TIERNEY, et al., Plaintiffs-Appellants,**

v.

**CITY OF TOLEDO, Toledo Police Patrolman's Association, et al., Defendants-Appellees.**

Nos. 85–3016, 85–3290.

United States Court of Appeals, Sixth Circuit.

Originally Argued Dec. 9, 1985.

Decided July 27, 1987.

Rehearing and Rehearing En Banc Denied Sept.14, 1987.

Glenn M. Taubman (argued originally), National Right to Work Legal Defense Foundation, Inc., Springfield, Va., R. Timothy Bauer, Boggs, Boggs & Boggs, Toledo, Ohio, for plaintiffs-appellants.

Ralph J. Lewis, Ted Iorio (argued originally), Gallon, Kalniz, & Iorio, Toledo, Ohio, for defendants-appellees.

Before ENGEL and MILBURN, Circuit Judges, WOODS,* District Judge.

ENGEL, Circuit Judge.

The principal issue in this civil rights litigation is whether the First and Fourteenth Amendments are offended by a plan requiring objecting non-union policemen to contribute a "service fee" as their "share" of the union's costs of negotiating and maintaining its collective bargaining agreement with the City of Toledo. It was our earlier view that the plan and the Toledo ordinance supporting it represented, as far as they had gone, a proper compliance with *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and we affirmed in an unpublished per curiam opinion. After granting certiorari, the Supreme Court vacated and remanded the case to us, —— U.S. ——, 106 S.Ct. 1628, 90 L.Ed.2d 175 (1986), for further consideration in light of *Chicago Teachers Union Local No. 1, AFT, AFL–CIO v. Hudson*, 475 U.S. 292, 106 S. Ct. 1066, 89 L.Ed.2d 232 (1986). After a careful reexamination, we are of the opinion that neither the plan nor the ordinance complies with the requirements of *Hudson* and we therefore reverse and remand in turn to the district court.

In 1983, the City of Toledo enacted an ordinance requiring its police officers either to become members of the Toledo Police Patrolman's Association or to pay to the union a service fee "not to exceed the amount of dues uniformly required of members of the TPPA." Toledo Municipal Code § 2129.97(a). The ordinance also mandates that the union shall notify non-members of this financial obligation and the procedures for collection of the fee. Under section 2129.97(b), the union must provide a procedure enabling non-members to recover that portion of the annual fee expended for political purposes "only incidentally related to wages, hours and conditions of employment." The ordinance delegates to the union responsibility for deter-

mining the procedures for non-members to make known their objections, the selecting of an arbitrator, the timing of his decision, and other matters involved in non-members' challenges of that portion of the union's fee that corresponds to the portion of union expenditures not incurred negotiating or administering a collective bargaining agreement. If employees do not pay their fee, the ordinance permits the union to pursue remedies under Ohio law. Section 2129.97(e).

The operation of the rebate procedure is set forth in a union plan, which we understand consists of three documents: TPPA Agency Shop Rebate Procedure, 1983 Agency Shop Fees, and Agency Shop Fees Paid in Membership Years Subsequent to 1983.[1] The plan requires a non-TPPA member to pay to the union an agency shop fee equal to 100% of union dues unless the employee objects by January 31, regardless of whether he knows how his contribution will be spent. Within fourteen days of making an objection, the dissenter must receive a copy of the refund procedure and the union budget. Upon making his objection for the first operating year of the plan, his entire payment is placed in escrow pending the determination by an "impartial umpire," of the amount to be rebated as the share of the fee that the union expended for ideological purposes unrelated to collective bargaining. The "impartial umpire" is selected by the TPPA from the membership of the National Academy of Arbitrators. Three weeks after the "impartial arbitrator" submits his written report to the union, it must send the dissenter his refund plus interest. The Agency Shop Fees Paid in Membership Years Subsequent to 1983 are identical to those for 1983, except that for those non-members who object by January 31, the union will place in escrow only the percentage of dues that the umpire determined was expended for ideological purposes during the preceding year, plus an additional five percent above that amount. The dissenter will then be informed of the amount placed in escrow and the basis for its determination, as well as the union budget, and that further communication regarding the amount

to be refunded will be sent after the end of the year.

The plan provides that those employees in arrears since the municipal ordinance was enacted must immediately satisfy their delinquencies in full. After the TPPA demanded that non-members pay full union dues, seventeen non-union member police officers brought this civil rights action under 42 U.S.C. § 1983 challenging the Toledo municipal ordinance as violative of the First Amendment and the Fourteenth Amendment's Due Process Clause, seeking declaratory and injunctive relief. In response, TPPA filed a motion to abstain (later withdrawn), a motion to dismiss, and a motion in opposition to the plaintiffs' motion for preliminary injunction.

By consent of the parties, the case was referred to a magistrate who on August 2, 1984, denied plaintiffs' motion for preliminary injunctive relief. Nonetheless, plaintiffs refused to remit agency fees, in violation of the magistrate's order, and so notified the district court. The TPPA then filed suit in Toledo Municipal Court for the collection of the agency fees, whereupon the plaintiffs sought injunctive relief against maintenance of the state court action. On December 11, 1984, the magistrate denied this motion under the Anti-Injunction Act, 28 U.S.C. § 2283. The plaintiffs then timely filed a notice of appeal from this order. The record indicates that the state court has agreed to stay its consideration of TPPA's collection suit pending a decision by this court of that appeal.

Upon cross-motions for summary judgment, the magistrate granted defendants' motion because in his view no First Amendment violation had occurred. He reasoned that although the plan might enable the union to briefly use funds extracted from the plaintiffs for ideological purposes, this would only "have an utterly de minimis impact upon the First Amendment issues at stake in this controversy." Plaintiffs filed another timely notice of appeal from this ruling. The appeals were consolidated.

1. We have appended to this opinion the ordinance and the three documents.

■ Our original unpublished opinion, issued before *Hudson, supra,* concluded that while there were deficiencies in the plan as submitted, its terms generally satisfied the requirements of *Abood.* We believed that any difficulties would be resolved by the procedures which we understood from the record would be forthcoming as the plan actually began operating. Our opinion reflected a view that there would be at least minor obstacles to overcome in the implementation of any plan when, as here, neither the union nor the employer had had experience enacting such a procedure. After carefully considering the commands of *Hudson,* however, and the reasoning behind them, we have concluded that that decision requires that before a non-union member may incur any obligation to contribute his fair share of the expenses of managing the collective bargaining agreement, there must be in place a constitutionally adequate plan. What follows, therefore, is an itemization of the minimal constitutional requirements which must necessarily be incorporated in any agency shop plan, and our observations concerning the inadequacies of the plan as it existed when summary judgment was granted in favor of the union and the city. We stress that it is not for us to rewrite the plan, which should essentially derive from the parties who must operate under it. The district court's function, and ours, is only to assure that any plan at least meets the minimum constitutional requirements under the First and Fourteenth Amendments.

## I.

While we emphasize that under *Hudson* and *Abood* the First Amendment permits an agency shop agreement, those cases recognize that to require a non-union employee to pay the same union dues as a union member restricts that employee's First Amendment rights of association and expression, to the extent that employee does not consent to such representation. Nonetheless non-members benefit from the operation of the collective bargaining agreement, and it is hornbook law that the government's interest in industrial peace justifies a minimal intrusion upon the non-members' First Amendment rights. *See*

*Hudson,* 106 S.Ct. at 1073 n. 8. Therefore, non-union employees may be required, as a condition of their employment, "to pay a fair share of the union's cost of negotiating and administering a collective-bargaining agreement." *Id.* at 1073, At the same time, "non-union employees do have a constitutional right to 'prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative.'" *Id.*

In *Hudson* the Supreme Court created procedural safeguards designed to "prevent[ ] compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activites." *Id.* at 1074, quoting *Abood,* 431 U.S. at 237, 97 S.Ct. at *Hudson* 's constitutional requirements fall into three general categories.

First, *Hudson* requires that the union procedure for obtaining a fair share of the expense of servicing the collective bargaining agreement from nonconsenting, non-union members must "avoid the risk that dissenters' funds may be used temporarily for an improper purpose." *Id.* 106 S.Ct. at 1075. To this extent at least, placing 100% of the monies withheld into escrow satisfies this narrow requirement. *Id.* at 1077. However, *Hudson* holds that a 100% escrow placement is not mandatory, for it would create "the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain." *Id.* at 1077–78. Nevertheless, we perceive some internal tension in *Hudson* regarding this first requirement. We do not believe that the reference to 100% escrow prevents the union from promptly using those funds that unquestionably reflect the proportion of the union's budget expended to negotiate and operate the collective bargaining agreement, *id.;* by the same token, however, we do not believe that the language was intended to enable the union to compel a non-consenting, non-union member to have any sum collected, even if placed in escrow, which would un-

questionably represent ideological expenses of the union. *Id.* at 1075.

*Hudson*'s second requirement is that the union procedure must "provide[ ] non-members with [ ]adequate information about the basis for the proportionate share." *Id.* In this regard the burden is upon the union to prove the proper proportion of union political expenses to total union expenditures. *Id.* To fulfill this burden, *Hudson* admonishes the union to give *"potential objectors . . .* sufficient information to gauge the propriety of the union's fee," *id.* at 1076 (emphasis supplied), before it collects any fees from non-members. Plainly the Supreme Court concluded that "requiring them to object in order to receive information" is impermissible. *Id.* at 1076. The union's proportionate share figures for its "major categories of expenses, as well as verification by an independent auditor," must be disclosed to all non-members. *Id.* at 1076 n. 18. Such disclosure must include an audited, detailed accounting of local union payments to affiliated state and national labor organizations that will be used for agreement and non-agreement related purposes. *Id.* This information must also be disclosed to all non-members whether or not they have yet objected to the union's ideological expenditures.[2] Once adequate, independently audited disclosure of the union's major categories of expenditures is made to all non-members, however, those who are dissatisfied with the ideological expenditures' existence or purpose or who challenge the accounting of the proportion of union expenditures that is ideological must make their objections known to the union. *Id.* at 1076 n. 16. Procedures thereafter must afford dissenting non-members a reasonable time to voice their objections and must not be framed so as to discourage the exercise of their First Amendment rights by intimidation or the imposition of unrealistic and excessively complex procedural requirements.

■ As explained in Part II, upon making their objections, dissenting non-members are entitled immediately to an "advance reduction" of that portion of their fees which an independent audit unquestionably indicates would be spent for ideological purposes.

> A *forced exaction* followed by a rebate equal to the amount improperly expended is thus not a permissible response to the nonunion employees' objections.

*Id.* at 1075 (emphasis supplied). During the first year of the plan's operation, once dissenters have made their objections known in accordance with a constitutional procedure, they may be required to pay into escrow that portion of the union fee that has accrued, at least since the constitutional procedure has been properly in place and operational, corresponding to the portion of union expenditures the independent auditor has determined to be other than indisputably ideological. Thus, *Hudson* indicates that the amount to be initially placed in escrow may be up to the union member's fee less the advance reduction. While the union is not required to withdraw any portion of the escrowed funds, it may obtain an immediate payment of those sums which according to the independent audit "it is unquestionably entitled to retain" as undoubtedly agreement-related. *Id.* at 1078. In future years, the union may calculate the advance reduction and amounts indisputably expended for agreement operation either under the procedures set forth above or by using the previous year's proportion of expenditures for ideological activities and to manage the agreement as determined by the impartial arbitrator. *Id.* at 1076 n. 18. Nevertheless, the union must continue to place in escrow each year at least that portion of the fee that the dissenter reasonably disputes.

*Hudson*'s third requirement is that the union's plan must "provide for a reasonably prompt decision by an impartial decisionmaker." *Id.* at 1076. "The nonunion employee, whose First Amendment rights are affected by the agency shop itself and

---

**2.** "Although public sector unions are not subject to the disclosure requirements of the Labor Management Reporting and Disclosure Act, See 29 U.S.C. § 402(e), the fact that private sector unions have a duty to disclosure suggests that a limited notice requirement does not impose an undue burden on the union." *Id.* at 1076 n. 17. Indeed, the union triggers no disclosure requirement until it voluntarily seeks to collect service fees from the non-union members.

who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner." *Id.* Nonetheless, the Supreme Court made it clear that a "full-dress administrative hearing, with evidentiary safeguards," *id.* at 1077 n. 21, is not an absolute constitutional requirement. Instead, "we think that an expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker, so long as the arbitrator's selection did not represent the Union's unrestricted choice." *Id.*

## II.

A careful review of the requirements of *Hudson,* therefore, yields the conclusion that the following provisions are essential for any plan meeting the constitutionally mininum requirements.

 We believe first, that no union or employer may take any action to enforce a non-union member's duty to pay any dues, whether through a deduction from wages or payment from wages already paid, until a plan with procedures meeting the commands of *Abood* and *Hudson* is established and operating. Specifically, all non-members must receive an adequate accounting, certified by an independent auditor and setting forth the major categories of the union's budgeted expenses, that enables a non-consenting employee to intelligently appraise what proportion of his dues would be allocable to the costs of negotiating and administering the collective bargaining agreement and that portion which would advance the union's ideological purposes. The independent auditor must verify each major category in the union's budget or expenses for each major category of expenses and indicate which categories comprise each component. First there is that component undeniably for ideological purposes. In our view, *Hudson* shows the Supreme Court's intention that, upon a non-member's objection, the union should not deduct any amount, for however short a time, which represents monies clearly expended for ideological purposes. The union simply cannot exact from the dissenter this proportionate amount, and must instead allow him an advance reduction of

that part of the union's fee immediately upon objection. We therefore believe that the Supreme Court's approval of 100% escrow as satisfying *Hudson*'s first requirement refers to escrowing 100% of the remaining, non-clearly ideological proportion of the fee which the union may collect. On the other hand, there is likewise that sum which, by independent audit, indisputably relates to the negotiation and administration of the collective bargaining agreement. In this regard, placing this audited portion of the fee in escrow satisfies *Hudson*'s first requirement, although *Hudson* plainly permits the union to obtain immediate access to that amount if it so chooses. With respect to the difference, we conceive that *Hudson* contemplates that to the extent the union asserts its right to retain and to employ such monies, and the objecting non-union members dispute that right, all such monies should be held in escrow pending resolution by an impartial decisionmaker.

 The arbitrator should be aware that *Hudson* contains another internal tension which at one time seems to hold that the non-consenting, non-union member is obligated to contribute only his proportionate share of the costs of negotiating and administering the collective bargaining agreement, while simultaneously emphasizing the non-union member's First Amendment right not to bear any union expenses incurred to advance the ideological activities without his consent. In this respect, *Hudson* implies that while these two categories of expenses are mutually exclusive, they normally total 100% of the expenses that the dues would fund. We believe that this is rarely if ever the case for any functioning union. Indeed, there is a "gray area" for many expenses that may concurrently advance neither or both of these interests, and which *Hudson* recognizes may be subject to dispute and hence to resolution by an impartial decisionmaker. Thus, an expense of doubtful use in advancing the union's ideological objectives is not automatically includable in the non-member's "fair share" service charge. The range of union expenditures will no doubt be as broad and varied as there are unions. It is not necessary for us to anticipate the

categorization of any potential expense, for we see this as an administrative determination by the independent decisionmaker, under the law developing in cases such as *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). Therefore, the union may not claim a right to receive from the non-union member full union dues covering *all expenses except those items which are ideological in purpose.* Instead, it may collect *only for those expenses affirmatively related to the bargaining agreement* because these constitute the only expenditures that, consistent with the First and Fourteenth Amendments under *Abood* and *Hudson,* the union may collect to prevent non-members' "free riding." *Hudson,* expresses a clear legal standard governing the arbitrator's allocation of permissible and impermissible expenses: The union bears the burden of establishing the portion of the escrowed funds allocable to the cost of negotiating and administering the collective bargaining agreement. *Id.* 106 S.Ct. at 1075. The important consideration in our view is that the dissenting non-union member can be compelled through arbitration or otherwise to pay for only those sums which are fairly attributable to agreement-related purposes, and while the burden may be upon him to voice his objection, the burden of showing entitlement to those funds remains with the union, even during arbitration.

### III.

■ We turn now to the plan which is currently under scrutiny. As we mentioned earlier, it consists of at least four documents, including Toledo Municipal Code 2129.97. Our discussion here is directed only to what we conceive to be the overall deficiencies of the plan as it is currently established. Plainly the City of Toledo owes a duty to its non-union employees to assure that its ordinance will not permit the union to deprive them of their rights under the First and Fourteenth Amendments. *Hudson,* 106 S.Ct. at 1076 n. 20. Beyond that, however, we do not endeavor to allocate which procedural minima or guidelines must be contained in the ordinance and which may properly be incor-

porated in the TPPA's plan. To the extent the union-adopted plan is in compliance with the ordinance, is workable and constitutionally adequate, we believe that the ordinance itself will probably be wholly satisfactory. The ordinance and plan must work together in all events, and, between them, they must protect the plaintiffs' rights in clearly and simply understood language.

We proceed therefore to what we conceive to be the constitutional deficiencies in the plan as it presently exists.

### IV.

■ Our first difficulty with the current plan is its failure to satisfy *Hudson*'s requirement that the union be prevented from using dissenters' funds, even temporarily, for purposes not related to negotiation and administration of the collective bargaining agreement.

Section 2129.97(a) and (b) of the ordinance requires non-members to pay to TPPA an amount up to the dues paid by TPPA members, followed by a refund of that fee in proportion to TPPA expenditures for ideological purposes not germane to the operation of the collective bargaining agreement. The TPPA Agency Shop Procedure and 1983 Agency Shop Fees document require the non-union member to pay a service fee during the first year of the plan's operation equal to the full amount of a TPPA member's dues, which the union will place in escrow at a flat interest rate. In later years, under the Agency Shop Fees Paid in Membership Years Subsequent to 1983 document, the union will place in escrow only 5% more than the amount determined in the previous year to have been spent for ideological purposes not related to the collective bargaining agreement.

We conclude that the foregoing procedures are constitutionally deficient under *Hudson.* The procedures violate *Hudson*'s escrow requirements by mandating that the non-member pay full union dues *before* the union has calculated the mandatory advance reduction from those dues that represents the independently audited

percentage of union expenditures that furthers ideological and other purposes unrelated to collective bargaining. We also believe that this plan, contrary to *Hudson*, creates a forced exaction followed by rebate. The foregoing procedures violate *Hudson* because the fee in its entirety is placed in escrow, whereas under *Hudson*, as we read it, only those sums which correspond to amounts reasonably in dispute and, at the union's option, indisputably agreement-related, may be placed in escrow. Furthermore, the plan returns to dissenters only that portion of union dues expended for *ideological* purposes unrelated to the collective bargaining agreement, while under *Hudson* and *Ellis*, the union must refund the proportion of the fee not related to the negotiation and operation of the collective bargaining agreement. As we have pointed out earlier, the difference in these two formulations can, in our judgment, be substantial. Finally, the plan's provision for subsequent years that escrows only the amount the arbitrator decided was not agreement-related during the previous year is unconstitutional. While the Supreme Court permits this method to calculate advance reductions, the union at a minimum must still escrow those amounts reasonably in dispute.

■ The plan's second infirmity is that it contains no provision complying with *Hudson*'s requirement that detailed financial information concerning all major categories of union expenses, including those for payments made to affiliated unions, be audited by a certified public accountant independent of the union and provided to all non-members before any fees may be collected from them. Additionally it requires non-union members to object by January 31 of a given year whether or not there has been a constitutionally adequate disclosure. The plan is also procedurally deficient in this regard because it does not contain adequate constitutional procedures enabling non-members to make their objections known. A non-union member reading the proposed rules would simply not know how to make a prompt and effective objection.

■ Since *Hudson* places the burden of objection upon the employees (as contrasted to burden of proof), we do not consider unreasonable the plan's provision that each member be required to object each year so long as the union continues to disclose what it must before objections are required to be made.

**V.**

■ Finally we conclude that the Toledo plan fails the third requirement of *Hudson* that it "provide for a reasonably prompt decision by an impartial decisionmaker." As the Supreme Court noted in *Hudson*, while it had suggested the desirability of an impartial decisionmaker in *Abood*, it had not prior to *Hudson* directly ruled on that question. We are convinced that *Hudson* now makes this an imperative. *See Hudson*, 106 S.Ct. at 1076 and particularly footnotes 19 and 20. In our earlier opinion, in the absence of such guidance, we concluded that while the plan was incomplete, and while there was tension between certain sections of it, those deficiencies would be worked out in time and did not need court supervision in advance of the problem.

Turning to the Toledo plan, while we find the Toledo municipal ordinance itself to be silent on this point, the TPPA Agency Shop Rebate Procedure simply states that objecting employees within the bargaining unit "shall have 100% of their fees placed in an escrow account pending a determination by an impartial umpire as to the amount to be rebated (which amount to be rebated shall be that amount of the fees used to support partisan politics or ideological causes not germain [sic] to the work or policy of the Toledo Police Patrolman's Association in the realm of collective bargaining)." The 1983 Agency Shop Fees provision is at least more specific. It provides that the TPPA "will retain a member of the National Academy of Arbitrators, who is experienced in public sector labor relations, to serve as the agency shop fee umpire and arbitrator...."

*Hudson* does not endeavor to spell out with great particularity precisely what selection process will pass constitutional muster. While rejecting a suggestion by the

Seventh Circuit that a full-dress administrative hearing might be required, it concluded that the union's procedure in that case, which called for the union to select an arbitrator from "a list maintained by the Illinois Board of Education," *id.* at 1070, was unconstitutional. Thus the procedures here and those struck down in *Hudson* are identical in that the choice of the arbitrator is left to the untrammeled discretion of the union. *Id.* at 1077 n. 21. That the choice must be made from a list furnished by the Illinois Board of Education, or as here, from a list certified by the National Board of Arbitrators, is not a sufficient limitation upon the otherwise "unrestricted choice" of the union.[3] In this regard we can only refer the district court to the language of *Hudson* with the direction that it mandate that the parties formulate a plan for the selection of an impartial arbitrator in conformity therewith. As to the remainder of *Hudson*'s third requirement, we note that the current plan's timing provisions for the arbitrator to render his decision, which do not call for the dissenter to receive his refund until at least one year following his objection, are not "reasonably prompt."

## VI.

 From the preceding, we believe it is evident that further proceedings by the defendants aimed toward enforcing collection of a "fair share" service fee from the dissenting non-union members must be stayed by appropriate injunctive relief until a constitutionally adequate plan consistent with the holdings in *Abood, Hudson,* and this opinion is functioning. The magistrate declined to grant injunctive relief against state court proceedings to collect the agency shop service fees in the mistaken belief that such an action would be violative of the Anti-Injunction Act, 28 U.S.C. § 2283. However, inasmuch as the objectors' feder-

al action was filed before the union's state action, the Anti-Injunction Act would not in our view forbid the plaintiffs' request for injunctive relief. *See Lockport v. Citizens for Community Action,* 430 U.S. 259, 264 n. 8, 97 S.Ct. 1047, 1051 n. 8, 51 L.Ed.2d 313 (1977); *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 562 (6th Cir.1982).[4]

The judgment of the district court is accordingly VACATED and the cause REMANDED for reinstatement and further proceedings consistent with this opinion.

## APPENDIX

ORD. 233–83 Amending and supplementing Chapter 2129 of the Toledo Municipal Code by enacting a new Section 2129.97 entitled, "Agency Shop, Payroll Deductions and Dues Checkoff," to establish agency shop provisions for the classifications in the Municipal Service represented by the Toledo Police Patrolman's Association, Local 10; and declaring an emergency.

WHEREAS, the City has negotiated with the Toledo Police Patrolman's Association, Local 10, relative to the establishment of "Agency Shop Provisions," and "Impasse Solutions to Police Labor Negotiations" for the employees of the City represented by that organization; and

WHEREAS, the adoption of this ordinance dealing with the establishment of agency shop provisions in conjunction with the companion ordinance establishing impasse solutions to Police labor negotiations will contribute to the stability of the relationship between the City and its employees; and

WHEREAS, the efficiency and effectiveness of the government of the City will be

---

**3.** Although stating that the "arbitrator's selection [may] not represent the union's unrestricted choice," 106 S.Ct. at 1077 n. 21, *Hudson* is otherwise silent on the process of choosing the arbitrator. We therefore reserve the question whether both the union and the dissenting nonmembers must have input in the arbitrator's selection, or whether the union's unilateral selection of a third party that actually picks the particular arbitrator without further union in-

fluence constitutes a limitation on the union's power sufficient to satisfy *Hudson.*

**4.** We express no opinion whether the union may collect the "fair share" of expenses from the plaintiffs for the period between enactment of the Toledo ordinance and the promulgation of a constitutional plan once such a plan is in operation.

furthered by the enacting of these companion ordinances; NOW, THEREFORE,

Be it ordained by the Council of the City of Toledo:

SECTION 1. That Chapter 2129 of the Toledo Municipal Code, be and the same is hereby amended and supplemented by the addition thereto of a new Section 2129.97, Agency Shop, Payroll Deductions, and Dues Checkoff, to read as follows:

Section 2129.97. Agency Shop, Payroll Deductions and Dues Checkoff.

(a) In recognition of the Toledo Police Patrolman's Association's services to the bargaining unit and the Toledo Police Patrolman's Association's role in helping develop a more harmonious and stable labor relationship between the bargaining unit employees and the City, employees within the bargaining unit, within thirty (30) days of the effective date of this ordinance, or their date of hire, whichever is later, shall either become members of the Toledo Police Patrolman's Association or share in the financial support of the Toledo Police Patrolman's Association (TPPA) by paying to the TPPA a service fee not to exceed the amount of dues uniformly required of members of the TPPA.

(b) The TPPA shall notify non-members of their obligation to pay service fees and such notification will include the procedures for payroll deductions and direct cash payments. The TPPA must provide a procedure for non-members to recover any portion of the annual fee which is expended for activities or causes of a political nature or involving controversial issues of public importance only incidentally related to wages, hours and conditions of employment.

(c) The City shall deduct current TPPA dues, initiation fees and equal assessments and service fees from the paychecks of employees within the bargaining unit as set forth in the recognition clause who have signed the proper authorization cards, authorizing such deductions from the paychecks of the employee. Such deduction shall be made from the first paycheck of the month for which current dues, initiation fees, equal assessments or service fees

(each payable in advance) are due the TPPA.

(d) The City shall remit to the Secretary-Treasurer of the TPPA, dues, service fees, initiation fees, or equal assessments so deducted from the paychecks of the employees covered herein before the fifteenth (15th) day of that month. The City shall provide at reasonable intervals upon request by the TPPA, a list of those members and non-members on payroll deductions.

(e) Nonpayment of service fees, initiation fees, dues or other equal assessments may be pursued by the Union at its option through collection or other remedies permissible under Ohio law. The City will deduct any arrears in unpaid TPPA dues, service fees, initiation fees, and equal assessments owed to the TPPA, if and only if, the City has made an error in failing to deduct such dues, fees or equal assessments during a former payroll period, or if the City receives a court ordered garnishment of wages for such fees or other court order requiring the same.

(f) Payment of dues or service fees shall not be a condition of continued employment.

(g) The Union shall indemnify and save the City harmless against any liability that may arise out of, or by reason of, any actions taken by the City for the purpose of complying with the provisions of this Agency Shop Ordinance. In the event that the City is held to be responsible for the repayment of monies paid to the TPPA pursuant to this Agency Shop Ordinance, the TPPA to the extent of those funds actually received, shall reimburse same to the City and/or the designated employees involved.

(h) If any provision of this Section is invalid under Federal or State law, said provision shall be modified to comply with the requirements of said Federal or State law.

SECTION 2. That this ordinance, being an emergency measure, shall take effect and be in force from and after its passage. The reason for the emergency lies in the fact that this ordinance is necessary for the immediate preservation of the public peace, health, safety and property, and for the

further reason that the passage of said ordinance will contribute substantially to the stability of the relationship between the City and its employees represented by the Toledo Police Patrolman's Association, Local 10.

Vote on emergency clause: yeas 9, nays 0.

Passed: March 22, 1983, as an emergency measure; yeas 9, nays 0.

Doug DeGood
Mayor

## APPENDIX B

### TPPA AGENCY SHOP REBATE PROCEDURE

The agency shop refund procedure will operate in the following manner. In January of each year the dues payable by each member of the TPPA will be established. Those employees within the bargaining unit who do not wish to join the TPPA will pay an agency shop fee equal to 100% of the dues unless said employee objects by January 31st of each respective year to the payment of the agency shop fees for activities not germain to the collective bargaining process which are in support of partisan political or ideological causes not germain to the work or purpose of the Toledo Police Patrolmen's Association in the realm of collective bargaining.

Those employees within the bargaining unit who object as set forth above shall have 100% of their fees placed in an escrow account pending a determination by an impartial umpire as to the amount to be rebated (which amount to be rebated shall be that amount of the fees used to support partisan politics or ideological causes not germain to the work or policy of the Toledo Police Patrolmen's Association in the realm of collective bargaining).

The same procedure will be followed in subsequent membership years except that the amount placed in escrow will be 5% greater than the amount determined by the umpire in the preceeding membership year to be rebated.

### 1983 AGENCY SHOP FEES

1. Any person who has an objection to the payment of agency shop fees shall notify the Toledo Police Patrolmen's Association, 1947 Franklin Street, Toledo, Ohio 43624 by November 1, 1983 of his or her objections or is a plaintiff in *James Tierney, et al. v. City of Toledo, et al.*, case number C83–430 shall be considered those persons objections to the payment of agency shop fees which are used in support of partisan political or ideological causes not germane to the work of the TPPA or the policy of the TPPA in the realm of collective bargaining.

2. The agency shop fee shall be deposited in an escrow account at the Toledo Trust bank account number—which will pay a flat interest rate. Said fee shall be payable no later than the second pay period of each month. Those employees in arrears since the passage of the Toledo Municipal Code agency shop provision which was effective on April 1, 1983 shall immediately pay the full delinquency of the amount owed.

3. Within 14 days of the receipt of the objections as set forth in 1 above and implementation of this procedure, the dissenting fee payor shall receive a copy of

 (a) this refund procedure,

 (b) the 1983 Toledo Police Patrolmen's budget.

4. (a) Prior to the end of 1983 but no later than January 31, 1984 the TPPA will retain a member of the National Academy of Arbitrators, who is experienced in public sector labor relations, to serve as the agency shop fee umpire and arbitrator (hereinafter referred to as Umpire).

 (b) The Umpire will determine the percentage of the TPPA's total expenditures for said membership year that was expended in support of partisan political or ideological causes not germane to the work or policy of the TPPA in the realm of collective bargaining.

(c) In making a determination as it relates to (a) and (b) above the Umpire will be guided and controlled by the decisions of the United States Supreme Court in *Abood v. Detroit Board of Education* and any other United States Supreme Court decision which is controlling in the area.

(d) TPPA will provide the Umpire with copies of its budget for the 1983 membership year and such other documents as the umpire deems relevant. The dissenting fee payor may submit written material to the Umpire relevant to the aforesaid determination by mailing such material to "Representation Fee Umpire, c/o Toledo Police Patrolmen's Association, 1947 Franklin Street, Toledo, Ohio 43624". The material will be timely if received by the TPPA prior to January 31, 1984.

(e) The Umpire will submit a written report to the TPPA which sets forth the percentage called for in (b) above with the appropriate explanation.

5. (a) Within three (3) weeks of the receipt of the umpire's written report by the TPPA, the TPPA will send a dissenting fee payor a check for the amount of the final refund appropriate for his or her bargaining unit, plus such interest as paid by the Toledo Trust Company on such amount, and a notice informing him or her how the refund was calculated, together with a copy of the Umpire's report.

(b) The final refund will be paid from a dissenting fee payors escrow account, and any money remaining in said accounts after such payment will be distributed to the TPPA.

### AGENCY SHOP FEES PAID IN MEMBERSHIP YEARS SUBSEQUENT TO 1983

1. The procedure set forth above provides the refund procedure to be utilized in subsequent years. However, present persons in the bargaining unit who object to the payment of agency shop fees will beginning on January 1, 1984 be required to object to payment of agency shop fees by January 31st of each respective year.

2. By February 15th of each year the TPPA will:

(a) determine a preliminary refund which will be calculated by applying the percentages used to determine the final refund for the preceeding membership year to the membership dues for the membership year in question and adding an additional 5% of such amount to the dues amount which will be rebated.

(b) establish at a bank in Toledo, Ohio a flat rate interest bearing escrow account and deposit in said account an amount as calculated in 2(a) above and send the dissenting fee payor a notice informing him or her as follows:

(1) the amount of the refund that a preliminary determination indicates he or she is entitled to receive for the membership year in question and that this amount will be deposited in a flat rate interest bearing escrow account in a bank in Toledo, Ohio.

(2) the basis for this determination together with a copy of the TPPA budget for the membership year in question and

(3) that a further communication regarding the amount of his or her refund will be sent after the end of the membership year in question.

3. After the end of the membership year in question the procedure set forth above regarding final refunds as provided for in sections (4) and (5) for the 1983 membership year will be followed provided that:

(a) references to dates in 1983 will refer to the same date in the year in question.