James P. LEHNERT, Elmer S. Junker, James E. Lindsey, Sam C. Peticolas, John R. Schauble, and Theodore D. Speerman, Plaintiffs,

v.

The FERRIS FACULTY ASSOCIATION —MEA–NEA, Michigan Education Association, National Education Association of the United States, The Board of Control of Ferris State College, S. Eugene Bychinsky, Robert D. Ewigleben, Earl D. Gabriel, Robert P. Gerholz, Fran Harris, Delbert D. Long, Robert C. Redman, Thomas P. Scholler, Patricia M. Short, and Steven L. Thomas, Defendants.

No. G78–346 CA1.

United States District Court, W.D. Michigan, S.D.

Feb. 3, 1989.

1491

Allaben, Massie, Vander Weyden & Timmer by Sam F. Massie, Jr., Grand Rapids, Mich., Raymond J. LaJeunesse, Nat. Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs.

Mika, Meyers, Beckett & Jones by Steven L. Dykema, Grand Rapids, Mich., for defendant, the Bd. of Control of Ferris State College.

Mitchell E. Roth, Office of General Counsel, Nat. Educ. Ass'n, Washington, D.C., for Nat. Educ. Ass'n.

White, Beekman, Przybylowicz, Schneider & Baird by Arthur R. Przybylowicz, James J. Chiodini, Okemos, Mich., for Union defendants.

## OPINION

ENSLEN, District Judge.

### Background

Over two years ago, this Court enjoined the union defendants in this case from collecting future service fees from plaintiffs until the time the unions adopted constitutional standards for fee collection. I retained jurisdiction "for the sole purpose of determining if and when the union defendants have adopted constitutional procedures." *See Lehnert v. Faculty Association—MEA–NEA*, 643 F.Supp. 1306 (W.D. Mich.1986).

After a decade of litigation, and numerous revisions of the policy and procedures, I believe I have reviewed the last revision. Also before me is a motion by plaintiffs for an injunction pending appeal.

■ An order granting defendant unions' pending motion would be a final judgment dissolving an injunction. Federal Rule of Civil Procedure 62(c) provides that when an appeal is taken from a final judgment dissolving an injunction, "the court in its discretion may ... restore, or grant an injunction during the pending of the appeal." An injunction pending appeal may be sought before judgment is entered and appeal noticed, if "there is reason to believe that an appeal will be taken...." *Thomas v. City of Evanston*, 636 F.Supp. 587, 590 (N.D.Ill.1986) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* ¶ 2904, at 324 (1973)).

That is the case here. In a December 9, 1988 opinion, 707 F.Supp. 1482, this Court tentatively approved the union defendants' service fee collection procedures, except for one objectionable sentence. I stated that if the union defendants submitted an affidavit stating that the current procedures—minus the objectional sentence—are acceptable and currently reflect the administrative procedures of the union, the Court would grant the defendants' Motion to Dissolve Injunction and would approve the revised procedures.

The defendants have submitted such an affidavit, and the Court is ready to grant the motion as it declared it would. Before me, however, is a motion that is appropriately decided at the same time—plaintiffs' motion for an injunction pending appeal. The plaintiffs have stated that they will file an appeal to the Sixth Circuit on three issues: First, whether the unions' calculation of the reduced fee must be independently audited. Second, whether this Court should have allowed discovery of and examined the financial data which the unions propose to send to nonmembers. Last, whether the Court properly denied discovery on the issue of the impartiality of the American Arbitration Association ("AAA"). Plaintiffs' Brief in Support of Injunction Pending Appeal, at 2 (October 13, 1988).

Therefore, I will consider plaintiffs' motion in anticipation of my impending judgment dissolving the defendants' injunction which has been in effect now for over two years.

**1492**

*Injunction Pending Appeal*

■ In deciding whether to grant an injunction pending appeal, the court must balance the same factors as in evaluating a motion for a preliminary injunction. *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir.1987); *Accident Fund v. Baerwaldt,* 579 F.Supp. 724, 725 (W.D.Mich.1984).

These factors are:

1. Whether the plaintiff has shown a strong or substantial likelihood of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Forry, Inc. v. Neunodorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988); *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

This type of injunctive relief is an extraordinary remedy best used sparingly. *Roghan v. Block,* 590 F.Supp. 150 (1984).

The Sixth Circuit has cautioned courts that they should not view these factors as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir.1985). Thus, a court can enter a preliminary injunction if it finds that the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir.1982). "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff [however], the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985). Also, as the strength of showing as to irreparable harm increases, the necessity to

show likelihood of success on the merits decreases. *Ardister v. Mansour,* 627 F.Supp. 641, 644 (W.D.Mich.1986).

■ *1. Likelihood of Prevailing on Appeal.* Plaintiffs argue that their appeal will raise substantial questions, including: first, whether the unions' calculation of the reduced fee must be independently audited to reduce "the risk that the reduced fee collection from the objectors would be in excess of what is appropriate," *Lehnert v. Ferris Faculty Ass'n,* 707 F.Supp. 1473, 1479–80 (W.D.Mich.1988). Second, whether the Court should have allowed discovery of and examined the financial data which the unions plan to send to nonmembers; and third, whether the Court properly denied them discovery on the issue of the impartiality of the American Arbitration Association ("AAA").

Plaintiffs suggest that the above questions have not yet been precisely treated by *Hudson* or its Sixth Circuit progeny, *Tierney* and *Damiano.* See *Chicago Teacher's Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Tierney v. City of Toledo,* 824 F.2d 1497 (6th Cir. 1987); *Damiano v. Matish,* 830 F.2d 1363 (6th Cir.1987). On the first question—the need for an independent audit—I still believe it is unnecessary for a court to pass upon the actual source documents in order to decide on the validity of the service fee procedures. In *Andrews v. Education Association of Chesire,* 829 F.2d 335 (2nd Cir.1987) and *Lowary v. Lexington Board of Education,* 704 F.Supp. 1456 (N.D.Ohio 1988), two models the parties have used in developing valid procedures, neither court found it necessary to shuffle through the unions' financial reports, audit verifications, work papers, instructions to staff, or the accounts payable and general ledger systems.

To allow such discovery and to oversee this closely would be squarely against the doctrine espoused by this Court and others —that courts are to be at most minimally involved in labor disputes. This Court's function is to review the structure of the plan, adjudging whether it meets its constitutional threshold; the Court's function is most definitely not to supervise the day to day operations of the plan. I agree with the reasoning of Magistrate Carr who re-

cently denied a similar discovery request by plaintiffs in the post-remand *Tierney* case, stating that to allow plaintiffs' request would result in judicial action "broader and more intrusive ... [than] it should or can be under *Tierney.*" *Tierney v. City of Toledo,* 123 F.R.D. 235 (N.D.Ohio 1988).[1]

The second question is based upon the plaintiffs' contention that the Court should have allowed discovery and should have actually inspected the financial data which the unions were planning to send to nonmembers. At the time I considered this issue, the plaintiffs argued that in order for a nonmember to make an "intelligent and informed objection" to the use of his service fees, the auditor should verify whether there are established legal criteria and contemporaneous hard data which show the purpose of expenditures, and which reasonably justify the union's allocation. Further, plaintiffs asserted that where such "legal criteria" and "contemporaneous hard data" are absent, the auditor should ensure that that fact is disclosed to nonmembers. Plaintiffs argued further that if an auditor merely accepts at "face value" the union's definition of chargeable costs and its method of allocating costs as chargeable or nonchargeable, little reliability is added to the union's calculation and that the auditor's "blind approval" is likely to mislead employees into not objecting.

I still read *Hudson, Tierney,* and *Damiano* as requiring that an independent auditor, at the audit stage, verify the union's calculations and disbursements—but not the chargeability decision—which go to the nonmembers. Plaintiffs' view of *Tierney* would have an independent auditor making a legal as well as an accounting decision.

This seems unwise for several reasons. An impartial decision-maker, at a later stage if necessary, will make a decision as to whether the chargeability decision of the union is appropriate. Moreover, if my role in this matter is simply to test the proposed procedures against the constitutional requirements of *Hudson,* the Supreme Court quite clearly stated that:

> The union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor.

*Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18.

*Hudson's* verification requirement does not appear to call for an initial chargeability analysis. *Hudson* and its progeny allow the union to immediately collect for clearly chargeable expenditures and only require escrowing of "gray area" expenditures. The union defendants here provide that the entire reduced agency fee may be put in escrow. Thus the issue of what activities are chargeable or merely "gray areas" was not even seriously at issue in this case.

In any case, *Tierney* may best shed light on this issue originally raised by plaintiffs. The Sixth Circuit stressed that the range of union expenditures would be "broad and varied," as are the unions. "It is not necessary for us to anticipate the categorization of any potential expense, for we see that as an administrative determination *by the independent decision maker.*" *Tierney,* 824 F.2d at 1504–505 (emphasis added).

---

1. As I have previously stressed:

> The role of this Court [under *Tierney*] is, therefore, to be more passive than active; at most it is to provide oversight at this initial stage of review and approval, and to refrain from and resist any tendency toward direct involvement in regulating the plan's implementation....
>
> The request to take discovery at this preliminary stage and the possibility that that request, if granted, will lead to further disputes and opportunities for greater involvement by this Court raise the prospect for ever-increasing participation by the Court in the day-to-

day, issue-to-issue operational activities as the plan is implemented. Such involvement by the court is contrary to the role projected by the Sixth Circuit in *Tierney.* As important, it would be contrary to the fundamental policy that courts are to be at most minimally involved in labor disputes, and that extra-judicial means of dispute resolution—including primarily arbitration—are preferred.

*Lehnert v. Ferris Faculty Ass'n–MEA–NEA,* 707 F.Supp. at 1476 (W.D.Mich.1988) (quoting *Tierney v. City of Toledo,* 123 F.R.D. 235 at 236–37 at 2 (N.D.Ohio 1988)).

The third, and last, question plaintiffs intend to raise on appeal is the propriety of the Court's decision to disallow discovery on the issue of the impartiality of the American Arbitration Association ("AAA"). On this point, plaintiffs observe that although *Damiano*, 830 F.2d at 1371–72, upheld selection by the AAA of the "impartial decisionmaker" required by *Hudson*, 475 U.S. at 307–08, 106 S.Ct. at 1076–77, it contemplated that parties in other cases could attempt to make a more complete record than was available there. Plaintiffs argue the Court's denial of plaintiffs' requests for discovery on this issue is contrary to the principle that full discovery should be permitted in an action under 42 U.S.C. § 1983. *See Tarleton v. Meharry Medical College*, 717 F.2d 1523, 1535 (6th Cir.1983).

I note that the standard enunciated in *Hudson* requires that nonmembers obtain "a reasonably prompt decision by an impartial decision maker" as to whether the reduced fee consists of only constitutionally chargeable costs. *Hudson*, 475 U.S. at 307, 310, 106 S.Ct. at 1076, 1078. Under the unions' proposed procedures the impartial decision maker will be "an arbitrator ... selected pursuant to the Rules of Impartial Determination of Union Fees of the [AAA]." Further, under those rules, the AAA will select an arbitrator from a special panel of experienced labor arbitrators.

At the time, plaintiffs argued that because the AAA is neutral between unions and employers does not mean that it is impartial between union and non-union employees. Among the "fairer alternatives" plaintiffs suggested was mutual arbitrator selection by the Michigan Education Association ("MEA") and representatives of nonmembers' interest or appointment by a government agency such as the Federal Mediation and Conciliation Service.

Plaintiffs' affidavits at the time did not raise a material fact regarding the issue of actual or apparent bias of the AAA. I am not convinced—nor was I then—that the standard I should apply is one of "fairer procedures" from the perspective of one of the parties. The standard is whether the procedure meets the constitutional minimum, and the use of the AAA comports with the impartiality requirement set forth in *Hudson*.[2]

It is unlikely in my view that plaintiffs will prevail on the third issue either. As happened in *Damiano*, this Court found the proofs presented by plaintiffs to be insufficient to raise a genuine issue of material fact. Also *Damiano* was clear that courts have been on the whole hesitant to find that "generalized attitudes or opinions would serve to disqualify an individual from serving as an impartial decision maker." *Damiano*, 830 F.2d at 1371. *See also Robinson v. New Jersey*, 806 F.2d 442, 450 (3d Cir.1986). Plaintiffs' argument that *Damiano* contemplated subsequent parties in other cases to develop fuller records than in that case is simply not supported by any language in the case, and is strikingly counterintuitive.

Further, while it is true that cases premised on alleged violations of civil rights ought not to be disposed of at summary judgment before an adequate record is developed, *Tarleton*, 717 F.2d at 1535, some of the underlying reasons for this rule of law are not present in this case. I believe discovery on the impartiality of the AAA is quite unlike the discovery problems civil rights plaintiffs encounter where a claim for relief involves an inquiry into an individual defendant's or another party's state of mind.[3] This problem contrasts with dis-

**2.** As I have noted, the proposed rules here specifically prohibit the union from waiving an oral hearing pursuant to Rule 19 of the AAA rules. This is consistent with *Andrews* which enjoined the use of the waiver provision found in the AAA's rule for impartial determination of union fees.

**3.** For instance, where lawsuits allege abridgement of constitutional rights, questions of mo-

tive, knowledge, malice, and other individual state of mind questions are properly decided by the fact-finder and not the court on summary judgment. *See, e.g., Slay v. Alabama*, 636 F.2d 1045 (5th Cir.1981); *Eichman v. Indiana Univ. Bd. of Trustees*, 597 F.2d 1104 (7th Cir.1979); *Augenti v. Cappellini*, 84 F.R.D. 73 (M.D.Pa. 1979); *Shifrin v. Wilson*, 412 F.Supp. 1282 (D.D.C.1976).

covery on the general allegation that the members of a group on the whole tend to show bias against nonmembers of a union. Further, courts have not hesitated to grant summary judgment in constitutional or civil rights litigation where, as here, the affidavits fail to raise an issue of fact. *See, e.g., Hampton v. Gilmore,* 60 F.R.D. 71 (D.Mo. 1973), *aff'd,* 486 F.2d 1407 (8th Cir.1973).

Finally, the general rule is that the regulation of discovery practices under the Federal Rules of Civil Procedure is within the sound discretion of the trial court. Where further discovery is inappropriate due to undue burden, expense, or delay, the trial court's discretion—and its obligation under Rule 1—is to set proper limits. *Id.* Plaintiffs' argument that "full" discovery should have been granted ignores the fact that fullness at its extreme is excess— which the trial court is obliged to prevent.

Therefore, taking account of plaintiffs' objections to my earlier rulings leads me to conclude that the element of "success on the merits" in the motion for injunction pending appeal has not been satisfactorily demonstrated. The plaintiffs show only that the existing body of case law has not specifically and explicitly addressed each detail of the *Hudson* requirements. I see nothing here that relates to a novel or perplexing issue of law likely to be resolved in plaintiffs' favor.

2. *Irreparable Harm.* Nor do I see adequate evidence of irreparable harm. Plaintiffs argue that if this Court erred in any respect in holding that defendant unions' revised procedures are constitutional, it will have incorrectly dissolved the existing injunction, and the deduction of service fees from plaintiffs' wages while an appeal is pending will harm them irreparably. The irreparable harm, according to plaintiffs, comes from the inability to use part of their wages for their own preferred political or ideological causes, and from the "chilling" effect of the "burden of objection," both of which result in loss of First Amendment freedoms. Plaintiffs maintain

that such an infringement of First Amendment freedoms cannot be later cured by a refund of money, since the opportunity to speak or support a cause may well have passed.[4]

The Court agrees that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed. 2d 547 (1976). *Accord Lehnert v. Ferris Faculty Ass'n,* 556 F.Supp. 316, 319 (W.D. Mich.1983). I simply do not see that at this point the plaintiffs' First Amendment rights are burdened or lost. At this stage of decade-long litigation, I am prepared to dissolve the injunction against defendant unions, because the policy and procedures now comport with constitutional mandates. If I believed the policy and procedures even minimally fell short of constitutionality, I would require further revision. I do not and I conclude that plaintiffs have not produced a showing of irreparable harm.

3. *Harm to Others.* In addressing potential harm to others, plaintiffs posit that if the Court grants the injunction pending appeal and the Court is affirmed, the unions will have experienced some delay in obtaining service fees as a result of the appeal. However, they argue, that will occur even if the Court does not grant an injunction pending appeal, because the unions have agreed to escrow plaintiffs' fees until all appeals of the court's approval of the procedures are exhausted. Plaintiffs' Reply Brief in Opposition to Injunction Pending Appeal, at 9. Plaintiffs suggest that fees not collected while the appeal is pending could be deducted retroactively from plaintiffs' wages once the appeal is resolved or, if they leave the employ of Ferris State College in the interim, could be recovered in a debt suit. Plaintiffs conclude that compared to the irreparable invasion of First Amendment rights that confronts plaintiffs, any harm that the unions could suffer from an injunction pending

---

4. Defendants argue that there is no irreparable harm because plaintiffs' service fees will be escrowed pending appeal. The collection of agency fees, however, even where 100% is es-

crowed violates the First Amendment if the procedures do not provide for proper information dissemination and a reasonably prompt decision by an impartial decisionmaker.

appeal is insubstantial. "This is a corollary of the high rank held by the First Amendment in the constitutional scale of values...." *Swope v. Lubbers,* 560 F.Supp. 1328 at 1334 (W.D.Mich.1983).[5]

Defendants vigorously challenge plaintiffs' contention that the unions may "suffer *some* harm." Plaintiffs' Reply Brief in Support of Injunction Pending Appeal, at 7 (emphasis added). First, defendants disagree with plaintiffs' conclusion that fees not collected while the appeal is pending could be deducted retroactively from plaintiffs' wages once the appeal is resolved. The defendants note that there has not yet been a decision regarding whether a union may attempt to collect service fees for a previous school year, pursuant to the terms of an agency shop clause in a collective bargaining agreement.[6] The uncertainty here makes plaintiffs' pat conclusions less persuasive.

Also, defendants argue that even if such retroactive collection were allowed, there would be substantial harm to the unions trying to collect retroactive service fees for those nonmembers who have left their employment. A debt suit is possible; *see, e.g., White Cloud Educ. Ass'n v. Board of Educ.,* 101 Mich.App. 309, 320–21, 300 N.W.2d 551 (1980), *appeal denied,* 418 Mich. 939, *appeal dismissed sub. nom. Jibson v. White Cloud Educ. Ass'n,* 469 U.S. 875, 105 S.Ct. 236, 83 L.Ed.2d 176 (1984), however, there is likely to be difficulty attempting to locate nonmembers who have left their employment.

4. *Public Interest.* I believe the public interest at this point in time favors denial of the injunction pending appeal. The unions' policy and procedures meet constitutional standards as interpreted by this Court, and in fact, in some instances, go beyond what is constitutionally required.[7] In a careful balancing process, this Court has continually attempted to preserve the separate policies of protection of First Amendment rights and fairness in preventing free riding. I have considered both parties' requests and objections over a long litigation period, and am satisfied that any valid constitutional concerns of the past no longer exist.

I therefore approve the policy and procedures and will grant defendants' motion to dissolve the injunction. After balancing all four factors, I will also deny plaintiffs' motion for an injunction pending appeal.

### 1987–88 FISCAL YEAR
### AND
### 1988–89 FISCAL YEAR
### OBJECTIONS TO POLITICAL IDEOLOGICAL EXPENDITURES

### ADMINISTRATIVE PROCEDURES

Step I

By November 30, 1988, or as soon thereafter as possible, the Executive Director of the Michigan Education Association or his or her designee shall determine the amount of MEA's, NEA's, and local associations' (for those locals collecting a local service fee) total expenditures for the 1987–88 fis-

---

**5.** Plaintiffs also point out that the balance of harms is not changed by the unions' agreement that an injunction pending appeal will apply to all nonmembers required to pay service fees to affiliates of the Michigan Education Association ("MEA"). All nonmembers have the same First Amendment rights as plaintiffs, *see Damiano v. Matish,* 644 F.Supp. 1058, 1059–60 (W.D.Mich. 1986), *rev'd on other grounds,* 830 F.2d 1363 (6th Cir.1987), and the potential harm to the unions is still merely monetary. In any event, the number is relatively small. In 1981–82 only about 300 nonmembers statewide were covered by the MEA's agency-shop agreements, Trial Transcript of Testimony of W.D. Culver at 98–99 (Jan. 13, 1986), compared to 76,000 MEA members, Trial Transcript, Vol. I (Testimony of P. McNenly), at 77 (Jan. 7, 1986).

**6.** Defendants also question *White Cloud Educ. Ass'n v. Board of Educ.,* 101 Mich.App. 309, 300 N.W.2d 551 (1980), cited by plaintiffs for the proposition that retroactive fee deduction or a debt suit are practices by which defendants could surely avoid or decrease any harm incurred from continuing the injunction. Defendants argue that in *White Cloud,* only one judge in a concurring opinion noted that a civil action might be used by a union to collect a service fee.

**7.** The proposed service fee procedures, as one example, provide for the escrow of the entire reduced service fee, not just the portion which is reasonably in dispute. *See* Appendix, at Step II, part (4).

cal year that were expended on chargeable and non-chargeable activities. The Executive Director or his or her designee shall then calculate the reduced fee that an objector will be required to pay for the 1987–88 fiscal year and the 1988–89 fiscal year based on expenditures during the 1987–88 fiscal year by the NEA, MEA, and local associations. The amount of the reduced fee for each year shall be further reduced by an additional Five Dollars ($5) to make allowance for disputed chargeable costs. By November 30, 1988, or as soon thereafter as possible, the Executive Director shall provide to all non-union employees who are required to pay an agency fee adequate information identifying the NEA's, MEA's and local associations' total expenditures for the 1987–88 fiscal year sufficient to enable them to assess the propriety of the service fee calculation. The information provided to non-union employees shall include:

(1) A list of expenditures made by the NEA and MEA, by major category, during the 1987–88 fiscal year verified by an independent auditor and an identification of whether the major category of expense, or a particular portion thereof, is chargeable to objectors;

(2) In those instances where a local association service fee is collected, a list of the local association's major categories of expenditures verified by an independent auditor and an identification of whether the major category of expense, or a particular portion thereof, is chargeable to objectors shall be provided.

(3) The amount of the reduced agency fee;

(4) The method used to calculate the reduced agency fees; and

(5) A copy of this procedure.

Step II

Within 30 days of the MEA providing the information identified in Step I, non-union employees shall give written notice to the Executive Director of MEA at 1216 Kendale Boulevard, P.O. Box 2573, East Lansing, Michigan 48823, either by mail or by personal delivery, of the non-union employee's decision to:

(1) Join the union and pay union dues;

(2) Pay a service fee equal to dues less the pro rata cost of liability insurance provided to union members;

(3) Pay the reduced fee as determined by the Executive Director; or

(4) Pay the reduced fee into an interest-bearing escrow account with First of America–Central Bank of Lansing, Michigan, and challenge the reduced fee.

The non-union member may challenge the NEA portion of the reduced fee, the MEA portion of the reduced fee, the local portion of the reduced fee, or any combination thereof. Failure to provide timely notice will result in the non-union employee being required to pay a service fee equal to dues less the pro rata cost of liability insurance provided to union members. The challenge to the reduced fee will serve as the challenge for both the 1987–88 and 1988–89 fiscal years. At the time of filing an objection, the non-member shall pay the full amount of the reduced fee for the 1987–88 fiscal year and that portion of the 1988–89 reduced fee which has accrued into the First of America–Central escrow account. Collection of service fees for non-members will not begin until after the period for written objection has expired. All such payments required of an objecting non-member by these procedures shall be paid into the First of America–Central escrow account and shall remain in said account until such time as the arbitrator has issued his or her decision on the proportion of the agency fee that is chargeable to non-members. Thereafter all such funds in the escrow account shall be disbursed in conformity with these procedures.

Non-union employees who become part of the bargaining unit after the MEA has provided the information identified in Step I, shall be provided with the information identified in Step I within 30 days of becoming a member of the bargaining unit and shall have 30 days from the time MEA provides the information in which to give

the written notice to the Executive Director of MEA described in Step II. If the non-union employee challenges the reduced fee and the challenge occurs too late to allow the employee to participate in the hearing described in Step III of these procedures, no separate hearing shall be held, but the non-union employee's agency fees will be determined based upon the hearing described in Step III.

Step III

Within 15 days of the deadline for providing written notice challenging the reduced fee, the MEA will initiate the procedure for a consolidated hearing of all objections before an impartial decision-maker. For this year only, the hearing will involve the agency fee for both fiscal 1987–88 and fiscal 1988–89, since the same data will be used to determine the fees. An arbitrator will be selected pursuant to the Rules for Impartial Determination of Union Fees of the American Arbitration Association (said rules being attached to this procedure) and the conduct of the hearing shall proceed in accordance with those rules, except that the union may not waive oral hearings pursuant to Rule 19.

After the hearing, the arbitrator shall determine the proportion of the agency fee that is chargeable to non-members under applicable law. The arbitrator shall issue the decision and determination not later than 30 days from the closing of the hearing, but in no event later than May 1, 1989, and submit copies to the MEA and to each objector. In no event may the arbitrator determine the agency fee that is chargeable to non-members to be an amount greater than the reduced agency fee.

After the arbitrator's decision, the MEA shall direct the disbursement of all funds in the escrow account, including interest, to the proper parties in accordance with the arbitrator's decision. If the objector has not paid sufficient money into the escrow account for the 1988–89 fiscal year, the objector shall be responsible for payment of the difference between the amount determined chargeable by the arbitrator and the amount actually paid into escrow.

The objectors and/or the NEA, MEA, or local association may challenge the arbitra-

tor's decision, pursuant to law, but such challenge, if successful, shall not result in an agency fee greater than that determined by the arbitrator.

POLICY REGARDING OBJECTIONS TO POLITICAL–IDEOLOGICAL EXPENDITURES

Upon timely objection, no individual required to pay a service fee to the Michigan Education Association (MEA) or a local affiliate shall be required, through the payment of such a fee, to contribute to the financial support of an ideological cause or political activity unrelated to collective bargaining, contract administration, grievance adjustment and lawfully chargeable employee representation. An individual who, in compliance with the administrative procedures established by the Executive Director of the Michigan Education Association, objects to the use of a portion of his/her service fees to support such an ideological cause or political activity shall be required to pay a reduced fee based upon a determination of the percentage of the MEA's annual expenditures for the prior year necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees.