William LOWARY, et al., Plaintiffs,

v.

**LEXINGTON LOCAL BOARD OF EDUCATION, et al., Defendants.**

No. C86–1536A.

United States District Court, N.D. Ohio, E.D.

Oct. 21, 1987.

Glenn M. Taubman, Rossie D. Alston, Jr., Nat. Right to Work Legal Defense Foundation, Inc., Springfield, Va., James Calhoun, Calhoun, Benzin, Kademenos & Heichel, Mansfield, Ohio, for plaintiffs.

Alexander M. Andrews, Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio, for all other defendants.

Ira Mirkin, Green, Schiavoni, Murphy, Haines & Scambati, Youngstown, Ohio, for Lexington Teachers Ass'n and Ohio Educ. Ass'n.

Loren L. Braverman, Kathleen McManus, Columbus, Ohio, for Anthony Celebrezze.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

The plaintiffs, William Lowary and Sara Wyatt, have brought this action under 42 U.S.C. § 1983 against defendants Lexington Local Board of Education and its members and officers, Robert Whitney, Mark Plotnick, Susan Umbarger, James Bollinger, Rick Bell, Helen Gilroy, the Lexington Teachers Association, and the Ohio Education Association. In their complaint, the plaintiffs allege that fair-share provisions of the collective bargaining agreement between the Lexington Teachers Association (LTA) and the Lexington Local Board of Education violates the constitutional rights of the plaintiffs as protected by the first and fourteenth amendments. The plaintiffs also allege that § 4117.09(C) of the Ohio Revised Code, which authorizes employers and unions to include an agency shop provision in the collective bargaining agreement, is unconstitutional. The State of Ohio, through Attorney General Anthony J. Celebrezze, Jr., has intervened to defend the constitutionality of the statute.

The parties have stipulated the following facts to the Court, which constitutes all the facts necessary for the Court to decide the issues in this case.

### II. JOINT STIPULATIONS OF FACT.[1]

A. *The 1984–85 School Year.*

1. William Lowary and Sara Wyatt were employed as teachers by the Lexing-

---

1. The parties submitted a joint stipulation of facts to the Court on July 28, 1987. The Court

ton Local Board of Education ("School Board").

2. The School Board, pursuant to O.R.C. § 4117.04, had recognized the Lexington Teachers Association (LTA) as the exclusive collective bargaining representative of all teachers in the school district.

3. The LTA was affiliated with the Ohio Edison Association (OEA), the National Education Association (NEA) and the North Central Ohio Education Association (NCOEA).

4. Plaintiffs were not members of the Lexington Teachers Association or any of its affiliates.

5. Beginning with the 1984–85 school year, the School Board and the LTA agreed to a "fair share fee" clause in their collective bargaining agreement. That clause stated:

ITEM 10—*Fair Share Fee:*

1. The fair share fee shall be an exclusive right conferred upon the Lexington Teachers' Association, as the exclusive bargaining agent. Each bargaining unit employee, upon employment and re-employment, shall annually either:

a. Sign and deliver to the Association an application for Association membership and, unless the annual dues are paid by cash, check, money order, or other approved method, sign and deliver to the Association an authorization to the Treasurer for payroll deduction of membership dues. The Treasurer, upon written notice from the president of the Association that a member has terminated membership, shall forthwith commence the check-off of the representation fee and assessments with respect to the former member and the amount of the fee for the remainder of the school year shall be the annual representation fee and uniformly applied assessments less the amount of Association annual dues or previously paid through payroll deduction, or;

b. In lieu of becoming a member of the Association, authorize the Treasurer to check off from the wages of the employee and pay to the Association an annual fair share fee equivalent to the total annual dues and uniformly applied assessments of the United Teaching Profession. All contracts of employment for positions in the bargaining unit shall contain the following language:

"This Contract of employment is subject to the Master Contract between the Lexington Board of Education and the Lexington Teachers' Association, the terms and conditions of which are incorporated herein by reference as through [sic] fully rewritten herein. By signing this Contract, I represent that I have been notified of the fair share fee provisions contained in the Master Contract, that I will, if I elect not to become, or remain, a member of the Association, pay to the Association the prescribed annual fees and uniformly applied assessments for service and benefits to be conferred upon me by the Association as my exclusive bargaining agent during the terms of my employment by the Board."

2. The president of the Association shall by July 1 annually certify to the Treasurer of the Board of Education the amount of the annual fair share fee and uniformly applied assessments for the ensuing school year. The Treasurer, upon receipt of the certification of the amount of the fees and assessments shall, on the basis of the documents referred to in paragraphs (a) and (b) of Section 1 above, deduct the dues of Association members pursuant to the payroll deduction authorization and deduct the fees and assessments to the Association. The deductions shall be in equal amounts beginning with the first pay in November and continuing for a total of ten (10) consecutive pay periods. The failure or refusal of the Treasurer to deduct the fair share fee, due to court order or

has adopted the stipulation and reproduced it below as presented by the parties. The Court

has made minor changes primarily in explaining references to certain documents.

otherwise, shall not relieve the employee of his/her liability to the Association for the amount of the fair share fees and assessments.

3. Implementation

Upon the effective date of this Agreement, the Board and Association shall jointly notify in writing, each employee in the bargaining unit of this fair share fee agreement. Such notice shall have attached thereto a copy of the exact language of this Agreement. Any non-member of the Association who elects to continue employment with the Board after the thirty (30) day period shall be deemed to have consented to receive the services and benefits to be conferred by the Association as the exclusive bargaining agent and shall be liable to the Association for the annual fair share fee and uniformly applied assessments, which, during the first school year of this Agreement only, shall be pro-rated on a monthly basis. The provisions of this section shall be in accordance with the appropriate part(s) of the public employee Collective Bargaining law of the State of Ohio.

6. At the commencement of the 1984–85 school year, copies of the collective bargaining agreement, containing the above-quoted language, were distributed to all teachers, including plaintiffs, by the School Board. Plaintiffs were therefore aware of the terms of the collective bargaining agreement.

7. On or about June 15, 1984, the LTA, pursuant to the terms of the fair share fee clause in the collective bargaining agreement, notified School Board Treasurer Helen Gilroy that the union dues and fair share fee amount owed from each teacher in the bargaining unit for the 1984–85 school year was $252.50.

8. The fair share fee of $252.50 for the 1984–85 year was equal to the amount of dues paid by voluntary members of the "United Teaching Professions," which includes the LTA, OEA, NEA and NCOEA. Plaintiffs were aware that the amount of the fair share fee had been set at $252.50 before any of it was deducted from their pay.

9. According to the OEA Constitution, the amount of dues paid by voluntary members of the OEA is calculated as ".0076 per dollar of the average salary for elementary and secondary public school classroom teachers in Ohio for the previous year rounded to the nearest dollar and an additional service fee of $12.50 to be allocated to the support of the UniServ Delivery System." The amount of dues paid by members of affiliated unions, the LTA, NEA and NCOEA, is set by each respective union. The total amount of dues for members of all affiliates for 1984–85 was $252.50.

The School Board had no input into the amounts the respective unions set as annual dues for voluntary members.

10. Prior to the November, 1984 collection of the fair share fee, in approximately September, 1984, LTA provided plaintiffs with documents entitled "NEA 1983–84 Expenditures By Service Areas" and "OEA 1983–84 Expenditures By Service Areas." [2] The School Board did not ask, nor was it provided by the unions, with financial information regarding the calculation of the fair share fee, prior to the commencement of the deductions. Nothing in the collective bargaining agreement provided for the School Board to perform or obtain independent audits of the finances of the unions.

11. On or about September 19, 1984, plaintiffs wrote to the LTA the letters objecting to the use of dues for purposes other than paying for the costs of negotiating, administering, and processing grievances under the collective bargaining

---

**2.** The documents represent an itemized breakdown of a union member's dues by service areas including: uniserve staff program; general field assistance; collective bargaining support; instruction and professional development programs; legal defense; internal communications and external public relations; legislative efforts; human and civil resources; training of elected leaders and staff; political action; advocate research; contingency and financial reserve; organizational maintenance; governance; and data processing.

agreement.[3] Plaintiffs did not notify the School Board of their objections to the deduction of fair share fees from their salaries, nor did they request that the Board assist them in any way in their objections or appeals to the union.

12. On or about September 27, 1984, the LTA responded to the plaintiffs' objections by letter, stating that:

> In response to your letter dated September 19, 1984, it is the position of the Lexington Teachers Association, NCOEA/OEA/NEA that the dues amount do specifically go towards negotiating and administering the negotiated agreement between the LTA and the Lexington Local Board of Education.
>
> If you wish to file an objection based on the provisions specified in the Ohio Revised Code Section 4117.09(C), I have enclosed a copy of the procedure for filing such objection.

Enclosed with the letter was a copy of the Ohio Education Association's Rebate Procedure (Appendix 1) which had been adopted in March, 1983 and which applied during the 1984–85 school year.

13. The plaintiffs and the unions did not correspond further during the 1984–85 school year.

14. The LTA has not established or maintained any rebate procedures of its own. The LTA followed the rebate procedure established by OEA.

15. The School Board did not establish or maintain any rebate procedures of its own.

16. The School Board has no input into the dollar amount of the fair share fee charged to nonmembers of the respective unions, according to the terms of the collective bargaining agreement. The School Board did not inquire, and was not advised by the unions, how the amount of the fair share fee was calculated. The School Board had no control over the dollar amount of annual dues which the respective unions charged union members, or the dollar amount charged to fair share fee payers, according to the terms of the collective bargaining agreement.

17. On or about October 31, 1984, the plaintiffs filed unfair labor practice charges against LTA with the Ohio State Employment Relations Board concerning the collection and use of their fair share fee money. On or about February 15, 1985, those charges were dismissed by SERB based upon a related decision in *Bowles v. AFSCME*, Case No. 84–UU–04–0783.

18. Beginning on or about November 9, 1984, and continuing for the next 9 bi-weekly pay-periods, the School Board deducted a fair share fee of $25.25 from each plaintiff for each pay period. Thus, by approximately March 16, 1985, the School Board had deducted $252.50 in fair share fees from each plaintiff.

---

**3.** Both letters are addressed to Mrs. Mary Bell, President Lexington Teachers Association and signed by the plaintiffs. The substance of the letters, in full, is as follows:

> Dear Mrs. Bell:
>
> You are hereby formally notified of my objection under the First and Fourteenth Amendments to the United States Constitution to the deduction, retention even temporarily, and expenditure of dues/fees from my paycheck for any purposes other than paying the costs of:
>
> (1) negotiating collective bargaining agreements with my employer;
> (2) administering collective bargaining agreements with my employer; and
> (3) processing grievances at my request with my employer.
>
> It is my belief that my dues/fees will be used for other than these three enumerated purposes, including but not limited to political, ideological, social, economic, and/or philosophic purposes or activities of all kinds or nature. I specifically protest and object to the use of my dues/fees for all such non-collective bargaining activities.
>
> Therefore, as is my right under the recent Supreme Court decision in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), I hereby demand that the amount of my dues/fees be immediately reduced to an amount representing only the pro rata amount necessary for collective bargaining, contract administration and grievance adjustment with my employer.
>
> Please have the courtesy to promptly reply to this letter.

19. The fair share fee money collected by the School Board was turned over periodically to the LTA. The LTA, in turn, sent all of the agency fees to the Ohio Education Association on a monthly basis, with the exception of $10.00 for LTA local dues. The OEA, in turn, sent some of the money to NEA and some to NCOEA.

20. The fair share fee money deducted from plaintiffs was never placed into any escrow account by any of the defendants or the non-party LTA affiliates.

21. Because plaintiffs did not respond to the September 27, 1984 letter from LTA, defendant unions did not consider the plaintiffs to have properly objected according to its Rebate Procedure. For this reason, neither William Lowary or Sara Wyatt received a refund or rebate of any of their fair share fee money for the 1984–85 school year

22. Pursuant to its rebate procedure (Appendix 1), the OEA selected Eric Schmertz to serve as its "fee umpire" to determine a rebateable amount for the 1984–85 school year. Subject only to the requirement in its rebate procedure that the fee umpire "be a member of the National Academy of Arbitrators who has experience in public sector labor relations," the OEA had unrestricted choice over the selection of Mr. Schmertz to serve as "fee umpire." No agency fee payer had the right to choose his own "umpire" or veto the election of Mr. Schmertz.

23. Mr. Schmertz reviewed the OEA's expenditures and programs and met with OEA officials and staff to determine a "rebateable" amount of the fair share fee, but no agency fee payers were informed of these meetings or allowed to participate in these meetings.

24. Mr. Schmertz was paid a fee plus expenses by OEA to serve as "umpire."

25. On approximately January 7, 1986, Mr. Schmertz issued a ruling.

B. *The 1985–1986 School Year.*

26. William Lowary and Sara Wyatt were employed as teachers by the Lexington Local Board of Education (School Board).

27. The School Board, pursuant to O.R.C. § 4117.04, had recognized the LTA as the exclusive collective bargaining representatives of all teachers in the school district.

28. The Lexington Teachers Association (LTA) was affiliated with the Ohio Education Association (OEA), the National Education Association (NEA) and the North Central Ohio Education Association (NCOEA).

29. Lowary and Wyatt were not members of the LTA or any of its affiliates.

30. For the 1985–86 school year, the School Board and the LTA agreed in their collective bargaining agreement to a fair share clause as stated in ¶ 5, *supra.*

31. On or about June 27, 1985, the LTA, pursuant to the terms of the fair share fee clause in the collective bargaining agreement, notified School Board Treasurer Helen Gilroy that the union dues and fair share fee amount owed from each teacher in the bargaining unit for the 1985–86 school year was $277.50.

32. The fair share fee amount of $277.50 for the 1985–86 year was equal to the amount of dues paid by voluntary members of the "United Teaching Professions," which includes the LTA, OEA, NEA, and NCOEA. Plaintiffs were aware that the amount of the fair share fee had been set at $277.50 before any of it was deducted from their pay.

33. According to the OEA Constitution, the amount of dues paid by voluntary members of the OEA is calculated as ".0076 per dollar of the average salary for elementary and secondary public school classroom teachers in Ohio for the previous year rounded to the nearest dollar and an additional service fee of $12.50 go be allocated to the support of the UniServ Delivery System." The amount of dues paid by members of affiliated unions, the LTA, NEA and NCOEA is set by each respective union. The total amount of dues for members of all affiliates for 1985–86 was $277.50.

The School Board had no input into the amounts the respective unions set as annual dues for voluntary members.

34. In approximately September, 1985, LTA provided plaintiffs with documents entitled "NEA 1984–85 Expenditures by Service Areas" and "OEA 1984–85 Expenditures by Service Areas." Plaintiffs were aware that the collective bargaining agreement contained a fair share fee provision, and that the deductions the prior year began in November and lasted through 10 bi-weekly pay periods. The School Board did not ask, nor was it provided by the unions, with financial information regarding the calculation of the fair share fee, prior to the commencement of the deductions. Nothing in the collective bargaining agreement provided for the School Board to perform or obtain independent audits of the finances of the unions.

35. On or about September 23, 1985, plaintiff Lowary wrote an objection letter to the LTA.[4] Lowary delivered a copy of his objection letter to Dr. Klenke, School Superintendent, but had no expectation that Dr. Klenke would take any action in connection therewith. Plaintiff Wyatt wrote no objection letter during the 1985–86 year, and received only the "Expenditure" sheets which she received in September, 1985.

36. The OEA had established a fair share fee rebate procedure (Appendix 1) which applied during the 1985–86 school year.

37. The LTA did not establish or maintain any rebate procedure of its own. The LTA followed the rebate procedure established by OEA.

38. The School Board did not establish or maintain any rebate procedures of its own.

39. The School Board had no input into the dollar amount of the fair share fee charged to nonmembers of the respective unions, according to the terms of the collective bargaining agreement. The School Board did not inquire, and was not advised by the unions, how the amount of the fair share fee was calculated. The School Board had no control over the dollar amount of annual dues which the respective unions charged union members, or the dollar amount charged to fair share fee payers, according to the terms of the collective bargaining agreement.

40. Beginning on or about November 8, 1985, and continuing for the next 9 bi-weekly pay-periods, the School Board deducted a fair share fee of $27.75 from each plaintiff for each pay period. Thus, by approximately March 15, 1986, the School Board had deducted $277.50 in fair share fees from each plaintiff.

41. The plaintiffs' fair share fee money was turned over immediately to the LTA by the School Board, neither of whom placed the money into an escrow account. The LTA, in turn, sent all of the fair share fees to the Ohio Education Association on a monthly basis, with the exception of $10.00 for LTA local dues. The OEA, in turn, sent some of the money to NEA and some to NCOEA.

42. The fair share fee money deducted from plaintiff Wyatt was never placed in any escrow account by the School Board. It was not placed into escrow by the union defendants or the nonparty LTA affiliates because they did not consider Wyatt to have objected.

43. OEA placed in an escrow account a total of $30.40 of Mr. Lowary's fair share fees during the course of the 1985–86 year. This amount of $30.40 was calculated by taking the prior years' (1984–85) rebate determination made by OEA "fee umpire" Eric Schmertz and adding 5% to that figure. The remainder of plaintiff Lowary's fair share fees were distributed by OEA among the NEA, NCOEA and OEA.

44. On or about January 21, 1986 Mr. Lowary received from OEA an acknowledgement of plaintiff Lowary's objection along with a copy of the 1985–86 OEA Budget.

45. On or about December 22, 1986, plaintiff Lowary received a check for $21.39 from the OEA, as a rebate for the

---

**4.** The letter is substantively identical to the letter identified in footnote 2, *supra.*

1985–86 year, along with an explanation of how the rebate was calculated. Mr. Wyatt did not receive either a rebate check or any of the information sent to Mr. Lowary on December 22, 1986 because the defendant unions did not consider Mrs. Wyatt to have objected.

46. OEA made the rebate determination of $21.39 based upon its own review of its 1985–86 expenditures.

47. In approximately August, 1986, the OEA adopted a new rebate procedure attached hereto as (Appendix 2). Before and thereafter, OEA representatives met with representatives of the State Employment Relations Board to determine whether the Board would serve as the impartial decisionmaker in the OEA's new procedure. The OEA believed the Board would so serve. However, in early 1987, a question arose about the Board's availability to serve in that role. OEA then chose to have the American Arbitration Association act pursuant to its Rules for Impartial Determination of Union Fees.

48. On approximately May 15, 1987, Mr. Lowary received the letter from the OEA regarding the use of the American Arbitration Association.

49. To date, i.e., July 28, 1987, the day the stipulated facts were filed with the Court, no notice of an American Arbitration Association hearing has been sent, and no hearing has occurred. If called to testify, a representative of AAA would state that arbitrator Marlin Volz has been selected by AAA pursuant to its Rules for the impartial Determination of Union Fees.

C. *The 1986–87 School Year.*

50. William Lowary and Sara Wyatt (plaintiffs) were employed as teachers by the Lexington Local Board of Education (School Board).

51. The School Board, pursuant to O.R. C. § 4117.04 has recognized the Lexington Teachers Association (LTA) as the exclusive collective bargaining representative of all teachers in the school district.

52. The Lexington Teachers Association (LTA) was and is affiliated with the Ohio Education Association (OEA), the National Education Association (NEA) and the North Central Ohio Education Association (NCOEA).

53. Plaintiffs are not members of the LTA or any of its affiliates.

54. In the current collective bargaining agreement between the LTA and the School Board (effective 9/1/86 through 12/31/88), the School Board and LTA have agreed to a fair share fee clause. That clause states:

### ARTICLE IV

### FAIR SHARE FEE

The fair share fee shall be an exclusive right conferred upon the Association, as the exclusive bargaining agent. Each teacher upon employment and re-employment, shall annually either:

A. Sign and deliver to the Association an application for Association membership and, unless the annual dues are paid by cash, check, money order, or other approved method, sign and deliver to the Association an authorization to the treasurer for payroll deduction of membership dues. The Treasurer, upon written notice from the President of the Association that a member has terminated membership, shall forthwith commence the check off of the representation fee and assessments with respect to the former member and the amount of the fee for the remainder of the school year shall be the annual representation fee and uniformly applied assessments less the amount of Association annual dues or previously paid through payroll deduction, or;

B. In lieu of becoming a member of the Association, authorize the Treasurer to check off from the wages of the employee and pay to the Association an annual fair share fee equivalent to the total annual dues and uniformly applied assessments of the United Teaching Profession. All contracts of employment for positions in the bargaining unit shall contain the following language:

"This Contract of employment is subject to the Negotiated Agreement between the Lexington Board of Education and the Lexington Teachers' Association, the terms and conditions of which are incorporated herein by reference as though fully rewritten herein. By signing this Contract, I represent that I have been notified of the fair share fee provisions contained in the Negotiated Agreement, that I will, if I elect not to become, or remain, a member of the Association, pay to the Association the prescribed annual fees and uniformly applied assessments for service and benefits to be conferred upon me by the Association as my exclusive bargaining agent during the terms of my employment by the Board."

C. The President of the Association shall, by July 1, annually certify to the Treasurer of the Board the amount of the annual fair share fee and uniformly applied assessments for the ensuing school year. The Treasurer, upon receipt of the certification of the amount of the fees and assessments shall, on the basis of the documents referred to in paragraphs (a) and (b) of Section 1 above, deduct the dues of Association members pursuant to the payroll deduction authorization and deduct the fees and assessments from the pay of every non-member employed in the bargaining unit and pay such dues, fees and assessments to the Association. The deductions shall be in equal amounts beginning with the first pay in November and continuing for a total of ten (10) consecutive pay periods. The failure or refusal of the Treasurer to deduct the fair share fee, due to court order or otherwise, shall not relieve the teacher of his/her liability to the Association for the amount of the fair share fees and assessments.

The Association agrees to indemnify and save the Board harmless against claims and suits that may arise out of or by reason of action taken by the Board in compliance with this article, provided that:

A. The Board shall give a ten (10) day written notice of any claim made or action filed against the Board for which indemnification may be claimed;

B. The Association shall reserve the right to designate counsel to represent and defend the Board;

C. The Board agrees to (1) give full and complete cooperation and assistance to the Association and its counsel at all levels of the proceeding, (2) permit the Association or its affiliates to intervene as a party if it so desires, and/or (3) to not oppose the Association or its affiliates' application to file briefs amicus curiae in the action;

D. The action brought against the Board must be a direct consequence of the Board's good faith compliance with this article; however, there shall be no indemnification of the Board if the Board intentionally or willfully fails to apply (except due to court order) or misapplies such fair share fee provision herein.

This indemnification shall not apply to any claims or suits filed prior to the effective date of this agreement.

55. Copies of the collective bargaining agreement effective September, 1986 through December, 1988, containing the above-quoted language, were distributed to all teachers, including plaintiffs, at the commencement of the 1986–1987 school year. Plaintiff William Lowary, on April 21, 1986, had entered into a 3–year limited teacher's contract with the School Board, which contract contained the language set forth in Article IV § B above. At the commencement of 1986–1987 school year, plaintiffs Lowary and Wyatt were provided with LTA enrollment forms setting forth the amount of annual dues for the United Teaching Professions in the amount of $296.50. Plaintiffs returned these forms unsigned. Copies of the completed forms indicating which teachers were union members or fee payers were forwarded by the LTA to the School Board between September 30, 1986 and November 1, 1986.

56. The amount of $296.50 for the 1986–87 year was equal to the amount of dues

paid by voluntary members of the United Teaching Professions, which includes the LTA, OEA, NEA and NCOEA. Plaintiffs were aware that the amount of the fair share fee had been set at $296.50 before any of it was deducted from their pay.

57. According to the 0EA Constitution, the amount of dues paid by voluntary members of the OEA is calculated as ".0076 per dollar of the average salary for elementary and secondary public school classroom teachers in Ohio for the previous year rounded to the nearest dollar and an additional service fee of $12.50 to be allocated to the support of the Uniserv Delivery System." The amount of dues paid by members of affiliated unions, the LTA, NEA and NCOEA is set by each respective union. The total amount of dues for members of all affiliates for 1986–87 was $296.50.

The School Board has no input into the amounts the respective unions set as annual dues for voluntary members.

58. In approximately September, 1986, LTA provided plaintiffs with documents entitled "NEA 1985–86 Expenditures by Service Areas," "OEA 1985–86 Expenditures by Service Areas" and the August 18, 1986 minutes of an LTA Executive Committee meeting. Plaintiffs were aware of the terms of the collective bargaining agreement and were aware that deductions would occur pursuant to the terms of the collective bargaining agreement.

59. In approximately August, 1986, the OEA adopted a new rebate plan (Appendix 2), which applies to agency fees collected from objectors during the 1986–87 school year. The OEA has determined that the impartial decisionmaker provisions of that rebate plan apply to the fair share fees collected during the 1985–86 school year. In adopting the new rebate procedure (Appendix 2), OEA relied upon the advice of its General Counsel, Jon Ziegler. He advised OEA that the new procedure complied with the *Hudson* decision and other applicable federal law. Pursuant to a Request for Production of Documents pursuant to F.R. Civ.P. 34, the defendant unions provided a copy of this rebate plan to plaintiffs' counsel in approximately September, 1986.

60. On or about September 26, 1986 plaintiffs Lowary and Wyatt wrote to the LTA and the School Board the letters stating that:

This is to inform you that I object to supporting any non-collective bargaining activities of the Lexington Teachers Association and its affiliates. I object to the collection of any agency fees from my salary until the procedures mandated by the United States Supreme Court in the *Hudson* case are met.

61. The LTA has not established or maintained any rebate procedures of its own. The LTA followed the rebate procedure established by OEA.

62. The School Board has not established or maintained any rebate procedures of its own.

63. The School Board had no input into the dollar amount of the fair share fee charged to nonmembers of the respective unions, according to the terms of the collective bargaining agreement. The School Board did not inquire, and was not advised by the unions, how the amount of the fair share fee was calculated. The School Board had no control over the dollar amount of annual dues which the respective unions charged union members, or the dollar amount charged to fair share fee payers, according to the terms of the collective bargaining agreement.

64. On November 14, 1986, the School Board deducted a fair share fee of $29.65 from each plaintiff. This fee deduction was equal to the amount that voluntary union members were required to pay to the LTA and its affiliates.

65. No fair share fees were deducted from plaintiffs' salaries on November 28, 1986 or December 12, 1986, pursuant to the Court's Temporary Restraining Order.

66. The fair share fee money deducted from plaintiffs on Nov. 14, 1986, was turned over to the LTA by the School Board. Neither the School Board nor the LTA placed any of that money into an escrow account.

67. On or about Dec. 16, 1986, the LTA turned plaintiffs' Nov. 14, 1986 agency fee payment, along with the other union dues and fair share fees collected from the bargaining unit employees, over to the OEA. On or about Jan. 9, 1987, plaintiffs sent letters to the OEA objecting to the collection of fees for impermissible purposes.[5] On Jan. 23, 1987, OEA placed into an interest bearing escrow account, on behalf of William Lowary and Sara Wyatt, $296.50 respectively.

68. On December 17, 1986, the court issued a preliminary injunction enjoining the School Board from deducting additional fair share fees until such time as the School Board certified in writing that it would place such fair share fees in an escrow account and not distribute such fees until further order of the court. On December 22, 1986, the School Board certified to the court that an escrow account had been established. Beginning on December 23, 1986, and continuing for a period of approximately six weeks, the School Board, pursuant to the court's preliminary injunction, deducted fair share fees of $29.65 from each of the plaintiffs' salaries and deposited them in the escrow account established, where those funds remain. On February 3, 1987, the defendant unions requested that the School Board cease taking further deductions from plaintiffs until such time as the within action had been tried and a judgment rendered. Pursuant to the Court's order of February 5, 1987, no further fair share deductions have been made from plaintiffs' salaries since that time.

69. On or about Dec. 15, 1986, the OEA sent to plaintiff William Lowary notice of the fair share deduction procedure and a copy of the National Education Association program budget for fiscal year 1986–87. He received those documents on or about Dec. 18, 1986. Sara Wyatt never received this material directly from the defendants, although her counsel received it from LTA/OEA counsel. The OEA mailed the documents to plaintiff Wyatt at the address listed on an OEA enrollment form signed by her at the beginning of the school year.

70. On approximately May 15, 1987, Mr. Lowary received the letter from OEA regarding the American Arbitration Association.[6]

### III. DISCUSSION.

The plaintiffs rely principally upon the recent Supreme Court decision of *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). In *Hudson*, the Supreme Court outlined the procedures necessary to prevent the compulsory subsidization of political and ideological causes through the payment of fair share fees by employees who do not support those causes. The Court held that any fair share fee payment system must in-

---

5. The substance of the letter is as follows:

I object, to the maximum allowable under the U.S. and Ohio Constitutions, to having any of my agency fee money *collected* or used, even temporarily, to support the multitudinous political, social, ideological and non-collective bargaining causes of the OEA and its affiliates.

Name:
Home Address:
Social Security No:
Employer:

I wish an *immediate* return of that portion of my agency fee money which you have admitted is "impermissible". Obviously, you had no right to *collect* this money in the first place, since you now admit it is non-chargeable.

*However*, I do *not* accept your self-serving calculation as the proper amount of my chargeable agency fee. I do *not* waive any right to a much higher rebate, and you cannot force me to do so as a condition of immediately returning to me the agency fee money which you had no right to collect in the first place. I will not, however, be filing any Ohio SERB charge, because doing so will not protect my paramount constitutional rights as enunciated in the *Hudson* decision.

6. *Miscellaneous Stipulated Facts:*

a. The parties have supplied true and correct copies of the decision of the Ohio SERB in *Liptak v. Youngstown State University Chapter of OEA*, Case No. 86–REPF–1–0033, and the Hearing Officer's Recommended Decision. The SERB's *Liptak* decision is currently under appeal by both sides.

b. The parties have provided the Court with true and authentic copies of American Arbitration Association publications.

clude a rebate procedure, and that the rebate procedure must include three general procedural safeguards designed to protect the first amendment rights of non-union members. First, the rebate scheme must insure that the employee's funds are not used, even temporarily, to support unrelated activities; "[a] forced extraction followed by a rebate equal to the amount improperly expended is thus not a permissible response to the non-union employees' objections." *Id.* 106 S.Ct. at 1075. Second, the employee must receive adequate information about the basis of the proportionate fee, because "[l]eaving the non-union employees in the dark about the source of the figure for the agency fee ... does not adequately protect the careful distinctions drawn in *Abood [v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)]." *Id.* 106 S.Ct. at 1076. Third, the rebate scheme must "provide for a reasonably prompt decision by an impartial decisionmaker ... [because] the non-union employee ... is entitled to have his objections addressed in an expeditious, fair, and objective manner." *Id.*

The plaintiffs have alleged that the rebate procedure used by the union to provide its non-union members an opportunity to object to the amount of the fair share fee and to allow the union to determine the appropriate fair share fee is unconstitutional for each school year since 1984. The rebate procedure in place during 1984–1985, the rebate procedure in place during 1986–1987 each differ from the other in some respects. Thus, the Court finds it useful to discuss each school year's rebate procedure separately for the purposes of determining its constitutionality.

### A. *The 1984–1985 Rebate Procedure.*

■ The defendants argue preliminarily that the plaintiffs' claims with respect to the rebate procedure in place during the 1984–1985 school year are barred by the statute of limitations. The Sixth Circuit has made clear that the statute of limitations applicable to § 1983 actions commenced in Ohio is the one-year statute of limitations contained in Ohio Revised Code § 2305.11. *Jones v. Shankland,* 800 F.2d

77, 80 (6th Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2177, 95 L.Ed.2d 834 (1987); *Mulligan v. Hazard,* 777 F.2d 340, 344 (6th Cir.1985), *cert. denied,* 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986). The issue becomes, then, on what date the plaintiffs' cause of action accrued with respect to their claim that the 1984–1985 school year rebate procedure violates their constitutional rights. In the Sixth Circuit,

> federal law governs the question of when ... [the] limitations period begins to run.... The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.... A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.

*Sevier v. Turner,* 742 F.2d 262, 272–73 (6th Cir.1984) (citations and footnote omitted).

The plaintiffs argue that their claim regarding the 1984–85 plan was not time barred because the "final phase" of the rebate procedure is not complete until January 7, 1986 when the umpire issued his rebate determination. The plaintiffs argue that because they had a right to bring an action at any point during the enforcement of the rebate procedure, the January 7, 1986 date is the latest point from which the limitations period should begin to run. Although the Court agrees that the January 7, 1986 date was the last date or phase of the plan, the inquiry of analysis remains on what date did the plaintiffs have reason to know of their alleged injury.

Plaintiff Lowary notified the LTA of his objection to the deduction of fair share fees from his paycheck on September 19, 1984. The plaintiff Wyatt notified the LTA of her objection to the deduction of fair share fees from her paycheck on September 21, 1984. Both plaintiffs mailed identical letters to the LTA. Each letter stated the following:

> It is my belief that my dues/fees will be used for other than these three enumerated purposes, including but not limited to political, ideological, social, economic, and/or philosophic purposes or activities of all kinds or nature. I specifically pro-

test and object to the use of my dues/fees for all such non-collective bargaining activities.

Each plaintiff specifically mentioned the first and fourteenth amendment to the United States constitution in their objection letter. Further, plaintiffs received copies of the 1984–1985 school year rebate procedure after they objected in late September, 1984. The school board began deducting the fair share fees on November 9, 1984 and made the last fair share fee deduction for the 1984–1985 school year in March of 1985. Of particular importance is the fact that on or about October 31, 1984, the plaintiffs filed an unfair labor practice charge with the State Employment Relation Board asserting that their constitutional rights had been violated by the fair share fee collection procedure. Moreover, on February 15, 1985, approximately one year and two months prior to filing of the complaint, the plaintiffs' grievance was dismissed by the SERB.

Regarding the January 7, 1986 date asserted by the plaintiffs, the Court finds that nothing happened on that date that would give the plaintiffs any more notice than the facts previously indicated. The umpire's decision did no more than reflect what rebate was due to those that had properly objected under the plan. The plaintiffs objected in September of 1984, but failed to follow the rebate procedure enforced by the union at the time. In sum, the January 7, 1986 date did nothing to put the plaintiffs on notice that any constitutional violations occurred. Rather, the events during the fall of 1984 clearly demonstrate that the plaintiff had due notice of their claims for constitutional violations under the fair share fee collection procedure.

The Court finds that any of the events in the fall of 1984 should have alerted the plaintiffs that the rebate procedure was unconstitutional and violated their constitutional rights and at the latest in February of 1986. Therefore, the Court concludes that the 1984–1985 school year rebate procedure claim is time barred.

B. *The 1985–1986 Rebate Procedure.*

█ The defendants argue preliminarily that the courts should not apply the *Hudson* decision retroactively to the 1985–1986 rebate procedure claim of the plaintiffs. The defendants raise a difficult issue, because the law of the Sixth Circuit with respect to retroactivity is unsettled. In *Gurish v. McFaul,* 801 F.2d 225, 227 (6th Cir.1986), a panel of the Sixth Circuit applied the Supreme Court's decision in *Loudermill v. Cleveland Board of Education,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), retroactively to a case in which the operative facts preceded the date of the *Loudermill* decision, without considering the three-part test of *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed. 2d 296 (1971). The rule in the Sixth Circuit, however, apparently is as follows:

> where .. the [Supreme] Court applies the announced rule to the case before it and makes no statement as to whether it intends the rule to have retroactive or only prospective effect as to other cases, it will be presumed that the Court intends that the rule be given retroactive application. This Court also held that in this situation it is inappropriate to apply the *Chevron* line analysis in determining whether the announced rule should be given retroactive effect as to other cases.

*Gurish,* 801 F.2d at 227. The *Gurish* case followed *Smith v. General Motors Corp.,* 747 F.2d 372 (6th Cir.1984) (*en banc*), which first announced the Sixth Circuit's retroactivity rule. The complicating factor is that another panel of the Sixth Circuit, in *Carter v. City of Chattanooga,* 803 F.2d 217 (6th Cir.1986), recently held that the Supreme Court's decision in *Garner v. Memphis Police Dept.,* 710 F.2d 240 (6th Cir.1983), should be applied retroactively after analyzing in detail the *Chevron* factors.

Despite the apparent conflict in the Sixth Circuit, the Court will apply *Hudson* retroactively to the plaintiffs' claims based on the 1985–1986 school year rebate plan. First, *Smith,* the case on which *Gurish* was based, was an *en banc* decision of the Sixth Circuit, and thus entitled to greater

consideration than an apparently contradictory panel decision. Second, the Court notes that the Sixth Circuit recently applied *Hudson* retroactively. *See Tierney v. City of Toledo*, 824 F.2d 1497 (6th Cir.1987). Thus, *Hudson* applies to the plaintiffs' claims based on the 1985–1986 school year rebate procedure.

■■■ The Sixth Circuit, in *Tierney*, has interpreted more precisely the minimum constitutional requirements that must be in place before a union may collect fair share fees pursuant to an agency shop agreement. The *Tierney* court started with the proposition "that no union or employer may take any action to enforce a non-union member's duty to pay any dues, whether through a deduction from wages or payment from wages already paid, until the plan with procedures meeting the commands of *Abood* and *Hudson* is established and operating." *Tierney*, 824 F.2d at 1504. The procedure must include not simply notice to non-members that a procedure exists and that the non-members may object, but rather

> all non-members must receive an adequate accounting, certified by an independent auditor and setting forth major categories of the union's budgeted expenses that enables a non-consenting employee to intelligently appraise what proportion of his dues would be allocable to the costs of negotiating and administering the collective bargaining agreement and that portion which would advance the union's ideological purposes.

*Id.* The accounting must clearly identify whether a particular major category of expense, is, in the auditor's view, for ideological purposes or for collective bargaining purposes. The accounting must break out the expenses in this manner, because the *Tierney* court held that the union may not deduct any amount as a fair share fee that constitutes monies that clearly a union used for ideological purposes. *Id.* The union must immediately reduce the objector's fair share fee by an amount equivalent to the amount identified by the accounting as representing monies expended for ideological purposes. By the same to-

ken, a union may collect and use for its benefit those amounts that clearly represent monies expended for collective bargaining related purposes. The union must escrow any amount that falls between the two clearly identified amounts, the so-called " 'gray area' for many expenses that may concurrently advance neither or both of these interests, and which *Hudson* recognizes may be subject to dispute and hence to resolution by an impartial decisionmaker." *Id.* The burden for showing entitlement to the disputed, escrowed fund remains with the union at the accounting stage and during arbitration. *Tierney*, 824 F.2d at 1505.

The *Tierney* decision's emphasis on providing a detailed accounting prior to requiring a non-member to object furthers the goal of *Hudson*. In *Hudson*, the Supreme Court was concerned that the tension between the non-union member's constitutional right to be free from coerced expression and the union's constitutional right to collect fair share fees from non-union members, and avoid the "free rider" problem. The procedural requirements of *Hudson* are intended to "prevent[ ] compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective bargaining activities." *Hudson*, 106 S.Ct. at 1074 (quoting *Abood*, 431 U.S. at 237, 97 S.Ct. at 1800). The specific accounting required under *Tierney* provides a ready mechanism for allowing the union to collect those monies unequivocably related to the collective bargaining process while at the same time preventing forced extraction from non-union objectors of funds unequivocably related to the union's ideological purposes.

■■■ The rebate procedure for the 1985–1986 school year is relatively simple. Once a non-union member files a written objection with the Local Teachers Union, the non-union member receives a copy of the document entitled "Administrative Procedure: Agency Shop Refund," and a copy of the previous year's budget for the NEA, the OEA, the appropriate OEA District As-

sociation, in the case of the plaintiffs, the NCOEA, and the local association, in this case for these plaintiffs, the Lexington Teachers Association. Upon receiving the objection, the OEA determines what it describes as the preliminary refund. The preliminary refund is computed by taking the percentage of non-collectible funds from the previous year, as determined by the impartial decisionmaker, and taking that percentage of the current year's designated fair share fee. The OEA then adds an additional 5% of the current year's dues to this amount, and places the entire preliminary refund into an escrow account. The non-union objector also receives an explanation of the basis of the previous year's percentage of non-collectible funds.

The OEA selects an impartial decisionmaker, which it calls the "umpire," who is a member of the National Academy of Arbitrators with experience in public sector labor relations. The OEA provides the umpire with copies of its budget and other documents requested by the umpire. The non-union objector may submit written material to the umpire by mailing the material to the OEA in Columbus by November 1 of that year. The umpire determines the percentage of OEA's total expenditures for the membership year that was "expended in support of partisan political or ideological causes not germane to the work of the employee organization in the realm of collective bargaining." Appendix 1. This same umpire computes the percentage of the NEA funds.

The OEA then computes a "final refund." The final refund is determined by taking the percentage of non-collectible funds from the OEA to the OEA fair share fee paid, and the percentage determined by the umpire as non-collectible NEA. The OEA takes the percentage of non-collectible funds attributed to the OEA and applies that percentage to the local affiliate and the appropriate OEA district association. The OEA issues a check in the amount of the final refund, plus interest, no later than December 31.

The OEA rebate procedure does not comport with the constitutional minimum requirements outlined in *Tierney*. First, the non-union objector must file a written objection prior to receiving copies of the budgets, which are the only financial information about the association expenditures received by the non-union objector. *Tierney* requires that the potential objector receive the accounting information prior to the filing of an objection. *Tierney*, 824 F.2d at 1503. Second, the financial information must set forth the major categories of the union's budget expenses in a manner that enables the non-union objector to determine a proportion of his dues that relate to the costs of negotiating and administering the collective bargaining agreement, and the proportion of his dues related to the union's ideological purposes. The budget information provided under the terms of the 1985–1986 rebate procedure is insufficient in that regard. The budget information does not identify those expenses of the union that clearly are related to ideological purposes, or those expenses that are clearly related to collective bargaining, negotiation and administration, and do not identify the "gray area" between those two categories that reasonably is in dispute. Thus, the financial information provided the non-union objector under the OEA rebate plan does not comply with the *Tierney* standard. Third, the financial information is not certified by an auditor as required under *Tierney*.

The OEA rebate procedure also runs afoul of *Tierney* with respect to its escrow provisions. Although the Supreme Court allows an association to base a current year advance reduction, the plan does not provide for the escrow of amount reasonably in dispute. Under *Tierney*, the union must identify an escrow amounts in those gray areas. The procedure also does not provide the non-union objector with an advance reduction in his dues based on the clearly ideological proportion of the fee. The OEA procedure calls for escrow of the entire preliminary refund, with the non-union objector receiving the rebate by check over a year later. Under *Tierney*, the association must return immediately to the objector the amount clearly related to ideological

expenses, and escrow either the gray area, or all the remaining monies collected.

The rebate procedure also does not provide for a reasonably prompt decision by an impartial decisionmaker. The OEA procedure provides that the OEA selects an arbitrator who is a member of the National Academy of Arbitrators. The *Tierney* court specifically rejected the procedure that allowed the union to choose the arbitrator because it "is not a sufficient limitation upon the otherwise 'unrestricted choice' of the union." *Tierney*, 824 F.2d at 1507. In addition, the OEA procedure calls for the final refund to take place by December of the following school year. The OEA procedure thus calls for the dissenter to receive the refund over one year after the objection. The *Tierney* court concluded that such a time period for receiving the final refund is not reasonably prompt. *Id.*

In conclusion, the rebate procedure in place during the 1985–1986 school year runs afoul of each of the three general categories of constitutional procedure required under *Hudson* and as applied by *Tierney*. The Court also notes that the OEA plan is remarkably similar to the City of Toledo procedure declared unconstitutional in no uncertain terms by the Sixth Circuit in *Tierney*.

■ The Court also finds that plaintiff Sara Wyatt failed to object to the fair share fee deduction in the 1985–86 school year. Stipulated Fact 35. It is well settled that the dissenting member bears the duty of objecting to the fair share fee before relief is granted. *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 306 n. 16, 106 S.Ct. 1066, 1076 n. 16, 89 L.Ed.2d 232 (1986); *Abood v. Detroit Board of Education*, 431 U.S. 209, 238, 97 S.Ct. 1782, 1801, 52 L.Ed.2d 261 (1977). Accordingly, any relief or damages as a result of the deduction, made in the year 1985–86 are foreclosed as to the plaintiff Sara Wyatt.

## C. *The 1986–1987 Rebate Procedure.*

The OEA changed its rebate procedure after the Supreme Court issued its decision in *Hudson*. Thus, the 1986–1987 school year rebate procedure is different from the rebate procedure used in 1985–1986.

The new procedure provides that the OEA will determine by November 15 of the fiscal year the percentage of impermissible expenses for the previous fiscal year. The OEA will calculate the percentage of impermissible expenses to the total expenses, and apply that percentage to the current fiscal year dues amount the OEA has previously declared. The OEA will add to its percentage the percentage the NEA reports of its dues that are impermissible. The OEA will take the combined percentage, calculated compared with the current fiscal year dues, and arrive at a rebate amount. The fair share fee is equal to the dues amount less the rebate amount.

The 1986–1987 rebate procedure also has a notice provision. By November 15 of the fiscal year, or by the date on which the OEA received the independently certified audit of its previous year's financial records for itself and the NEA, the OEA will notify all fair share fee payers of the amount of the fair share fee. Included in the notification will be an explanation of how the fees are calculated, copies of the audited financial records, and a copy of the fair share fee rebate procedure. The notice informs the fair share fee payer of the right to object to the amount of the fair share fee, and informs the fair share fee payer that he must mail the objection to the OEA within thirty days after a "determination date" identified by the OEA.

The new procedure also establishes two separate classes of objectors. Category 1 objectors indicate their willingness to accept the fair share fee amount computed by the association, that they waive their right to have an impartial decisionmaker review the association computed fair share fee amount, and that they are entitled to an immediate payment of their rebate. Category 2 objectors indicate that they wish to challenge the amount of the fair share fee computed by the association, that they desire 100% of all fair share fees collected by them to be placed in an escrow account, and that they wish an impartial decisionmaker to review the fair share fee amount

determined by the OEA. If the objection does not indicate which category the objector intends to participate in, the OEA assumes that the objector intended to be a category 1 objector.

The original 1986–1987 rebate procedure provided that the State Employment Relations Board (SERB) would serve as the impartial decisionmaker. Subsequently, the OEA altered the procedure and identified the American Arbitration Association (AAA) as the impartial decisionmaker. The AAA will make the impartial decision according to its own rules.

 The 1986–1987 rebate procedure does not comport with the requirements of *Hudson* and *Tierney*. The OEA apprises members of the bargaining unit of their right to be a fair share fee payer at the time they decide whether they want to become members of the union. The notice derived from the language of the collective bargaining agreement included in the teacher contract simply informs the bargaining unit member that he or she must pay fair share fees if they choose not to join the union. The collective bargaining agreement language does not in any way explain that a person may receive a rebate for certain expenses.

The procedure does not provide adequate time between the date on which the fair share fee payer receives the audited financial records of the OEA and the NEA, and the date of the first deduction of fees. As indicated in *Tierney*, the notice and opportunity to object must occur prior to the deduction of any fair share fees. *Tierney*, 824 F.2d at 1503.

The procedure provides that November 15th is the earliest date on which a fair share fee payer will receive the financial information; the first deduction always occurs sometime in early November. Although the financial information that appears to be the type that will be provided to the fair share fee payer does break the expenses down into chargeable and non-chargeable expenditures, the break down as it stands now does not divide the expenses into the three categories contemplated by the *Tierney* court: clearly chargeable expenses; clearly non-chargeable expenditures; and those expenditures that reasonably might be disputed by parties. The failure of the OEA to break the information down into these three groups prevents the OEA from complying with *Tierney*'s mandate that the fair share fee payer receive an immediate refund of the clearly non-chargeable expenses, and that the OEA escrow all of the monies that reasonably might be disputed.

The category 1 and category 2 differentiations in the procedures are similarly unconstitutional because *Tierney* mandates that all fair share fee payers receive an immediate refund of clearly non-chargeable expenses. Category 1 objectors receive an immediate refund, but must waive any right to dispute the amount of the preliminary refund. Category 2 objectors do not receive an immediate refund as required under *Tierney*. Thus, the category 1 and category 2 objector portion of the procedure does not pass constitutional muster.

Although the original 1986–1987 procedure contemplated the use of SERB as the independent decisionmaker, the OEA has substituted the American Arbitration Association as the independent decisionmaker. Thus, the issue of SERB's acceptability as the independent decisionmaker is moot, and the Court has no comment on the use of SERB as the independent decisionmaker. Although the plaintiffs argue vehemently that the American Arbitration Association is composed of pro-union personnel, and that the arbitrators selected by the AAA are necessarily biased, the Court is not persuaded by the plaintiffs' arguments. The Court in *Hudson* was concerned with situations where the selection of the independent decisionmaker was exclusively controlled by the union. The OEA's procedure calls for the AAA itself to select the arbitrator once the OEA informs the AAA that an impartial decisionmaker will be required to determine the amount of the fair share fee. With respect to the impartiality of the AAA and its rules, the Court is convinced that AAA can function as an impartial decisionmaker within the meaning of the Supreme Court in *Hudson*. *See, Andrews v.*

*Education Ass'n. of Cheshire,* 829 F.2d 335 (2d Cir.1987).

## IV. CONSTITUTIONAL CHALLENGES TO OHIO REVISED CODE, SECTION 4117.09(C).

The plaintiffs challenge the constitutionality of Ohio Rev.Code § 4117.09(C) both on its face and as applied to them. The plaintiffs first argue that the statute does not provide adequate procedural protection to non-members. The plaintiffs argue that requiring a rebate procedure without more fails to protect the significant first and fourteenth amendment rights of the plaintiffs. Therefore, according to the plaintiffs, the Act is unconstitutional on its face because it is not reasonably susceptible to any constitutional construction. The defendant and the Ohio Attorney General argue that the statute is constitutionally valid on its face because the statute may be applied consistently with the constitution.

■ The defendant's and the Ohio Attorney General rely heavily on *Robinson v. State of New Jersey,* 806 F.2d 442 (3rd Cir.1986) as a standard of analysis interpreting the facial constitutionality of a statute. The *Robinson* court stated that "[i]t is well established that the courts will not invalidate a statute on its face simply because it *may* be applied unconstitutionally, and only if it *cannot* be applied consistently with the Constitution." *Robinson,* 806 F.2d at 447 (emphasis in original) (relying on *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). The defendants and the attorney general point out that the Ohio statute specifically requires that the terms of any rebate procedure "conform[ ] to federal law." Although the 1985–86 and 1986–87 plans violate the constitutional minimums established by *Hudson,* the statute is not void of any constitutional application. The Court finds that with a proper constitutionally structured fair-share procedure, the statute can be read consistent with the Constitution. Accordingly, the plaintiffs' facial attack is not well taken because the plaintiff has failed to establish that the statute is neither so vague as not to afford procedural guarantees or so broad as to impose a chilling effect on the rights protected.

■ The plaintiffs next argue that the statute is unconstitutional as applied by the State Employment Relations Board (SERB). The basis of plaintiffs' claim is that the SERB dismissed the plaintiffs unfair labor grievance in violation of the *Hudson* standards. The SERB's dismissal of the plaintiffs' grievance was based on the SERB's decision in *Bowles v. American Federation of State, County and Municipal Employees, Ohio Council 8, Local 1543,* Case No. 84–UU–04–0783 (Aug. 28, 1984). *Bowles* held that a challenge to a rebate procedure under Ohio Rev.Code § 4117.09(C) cannot be raised under the Unfair Labor Practice Statute, Ohio Rev. Code § 4117.12. The Court agrees with the Ohio Attorney General when he states that "there is certainly nothing implicit in either *Hudson* or the Constitution that requires a state to permit challenges to rebate procedures to be following through a proceeding concerning unfair labor practices rather than specifically designed review procedures." Trial Brief of Intervenor Anthony J. Celebrezze, Jr., Attorney General of Ohio at 11. Moreover, *Bowles* merely held that the claim of a constitutional violation under § 4117.09 without more does not in itself establish sufficient probable cause that an unfair labor practice has occurred. The SERB stated that:

[p]erhaps it is conceivable that a factually and procedurally effective rebate claim would also support a charge of an unfair labor practice.... But in no event will rebate unfairness constitute a per se violation of the duty of fair representation. If a complaint is to issue, based on a claimed unfair labor practice, facts have to be adduced to support the charge.

*Bowles,* Case No. 84–UU–04–0783 at 3.

The Court finds that the plaintiffs' claim of an unconstitutional application of Ohio Rev.Code § 4117.09 is unsupported by the facts. Rather the SERB's decision reflects an application of the unfair labor practice

statute and not Ohio Rev.Code § 4117.09. Further, any assumed infringement on the plaintiff's rights by the SERB's dismissal are substantially protected by the statute's prescribed remedy procedure and the plaintiff's ability to seek redress in other forums such as this one.

## V. SCHOOL BOARD AND INDIVIDUAL MEMBERS' LIABILITY.

 The plaintiffs argue that the school board has committed independent constitutional violations under Ohio Rev. Code § 4117.09 by delegating full authority to the Union in the determination and collection of agency fees. The Board argues that they do not have an independent duty to provide a separate rebate procedure nor an independent duty to audit the union's financial determinations. Further, the defendant Board argues that the rebate procedure imposed on the union does not require duplicative responsibilities by the Board, e.g., the duty to provide a reasonably prompt opportunity for a decision by an impartial decisionmaker, and notice requirements.

The Court finds that the essence of the Board's argument is that they are only obligated to follow what the union instructs them to do, and thus they avoid liability for any wrongful act as long as a union was the impetus of the action. The Board's argument is inconsistent with *Hudson* and Ohio Rev.Code § 4117.09. *Hudson* implicitly recognizes that it is the government employer and the union who share the duty in establishing a constitutionally valid fair-share fee procedure. The union's duty, after all, is derivative to the fact that the employer is a governmental actor. To permit a public employer to escape any duty in the implementation of the plan, would impose a governmental standard of conduct on a purely private entity. *Hudson* and cases that follow simply do not support such a conclusion. *See, e.g., Tierney; McGlumphy v. Fraternal Order of Police*, 633 F.Supp. 1074 (N.D.Ohio 1986).

Accordingly, the Court declines to accept the defendant Board's request to dismiss the Board from this cause of action. Any equitable remedy must necessarily include the Board.

The individual board members, sued in their official capacity, argue that the plaintiffs have failed to establish any independent constitutional violation on their part. Further, that they are not necessary parties to fulfill any equitable relief awarded plaintiffs and are immune from compensatory damages. The plaintiffs have made no genuine claims as to the individual's liability outside of the allegations contained in their complaint.

The Court finds that the individual board members are not necessary to this action, having denied the Board's request to dismiss, nor has it been established that they independently violated the plaintiffs' constitutional rights. Accordingly, the Court will dismiss the claim against the individual board members.

## VI. CONCLUSION.

The Supreme Court has held that "the task of fashioning a proper remedy is one that should be performed by the district court after all interested parties have had an opportunity to be heard." *Hudson*, 106 S.Ct. at 1077 n. 22. However, it is not the function of this Court to write a constitutionally permissible plan. "The district court's function, . . . is only to assure that any plan at least meets the minimum constitutional requirements under the First and Fourteenth Amendments." *Tierney*, 824 F.2d at 1502.

Therefore, having determined that the plaintiffs have established that the plans in effect for the 1985–86 year and the 1986–87 years are unconstitutional, the Court will retain continuing jurisdiction over this matter to ensure that a constitutional remedy is established.

IT IS SO ORDERED.

### APPENDIX 1

### ADMINISTRATIVE PROCEDURE

### AGENCY SHOP REFUND

The Refund Procedure will operate as follows. During the 1982–83 membership

year, the Ohio Education Association (hereinafter "OEA") will place in an escrow account 100% of any agency shop fees received from dissenting fee payers. After the end of the membership year, an impartial umpire will determine the percentage of the total 1982–83 OEA expenditures that is in support of partisan political or ideological causes not germane to the work of the employee organization in the realm of collective bargaining. This percentage will provide the basis for allocating the money in the escrow account between the dissenting fee payers and the associations. The same procedure will be followed in subsequent membership years, except that the amount placed in the escrow account will be based upon the percentage determined by the umpire for the preceding membership year, plus a 5%–of–dues "cushion" to minimize even further the possibility that the agency shop fees of dissenting fee payers will be used for impermissible purposes.

A. *Agency Shop Fees Paid for the 1982–83 Membership Year*

(1) Any person who pays an agency shop fee for the 1982–83 membership year to an OEA local affiliate may file a written notice with the local affiliate objecting to the alleged expenditure of said fee for the purposes as stated above (hereinafter "dissenting fee payer"). The objection notice may be phrased in general terms (i.e., an objection to the expenditure of the fee for impermissible purposes) and need not identify specific expenditures. It will be timely if received by the local affiliate within thirty (30) days after the dissenting fee payer

(a) made his or her first payment of the agency shop fee, or

(b) was informed of his or her right to request a refund pursuant to this Refund Procedure, whichever is later.

Within ten (10) business days after receipt of any objection notice(s), the local affiliate shall file an exact copy of said notice(s) with OEA at its Columbus, Ohio Headquarters.

(2) Within ten (10) business days after an objection notice is received by OEA, OEA will deposit the amount that is received by the local affiliate and forwarded to OEA up to and including the date the local affiliate received the objection notice. Said deposit shall be in a flat-rate interest-bearing escrow account at a bank in Columbus, Ohio. OEA, in addition, will deposit in the escrow account the portion of the agency shop fee that the local affiliate receives and forwards to OEA subsequent to the date it received the objection notice, said deposits to be made within ten (10) business days after receipt of the money.

(3) Within ten (10) business days after an objection notice is received by OEA the dissenting fee payer will be sent a copy of

(a) this Refund Procedure, and

(b) the 1982–83 membership year budgets of the National Education Association (hereinafter "NEA"), OEA, appropriate OEA District Association and the relevant local affiliate.

(4)(a) Prior to the end of the 1982–83 membership year, OEA will retain a member of the National Academy of Arbitrators, who has experience in public sector labor relations, to serve as the Agency Shop Fee Umpire (hereinafter "Umpire").

(b) After the end of the 1982–83 membership year, the Umpire will determine the percentage of OEA's total expenditures for said membership year that was expended in support of partisan political or ideological causes not germane to the work of the employee organization in the realm of collective bargaining.

(c) In making the aforesaid determination, the Umpire will be guided, to the extent possible, by the decision of the United States Supreme Court in *Abood vs. Detroit Board of Education,* and such other decisions of federal and state courts and administrative agencies as he or she deems relevant.

(d) OEA will provide the Umpire with copies of its budget for the 1982–83

membership year and such other documents as he or she deems relevant. Any dissenting fee payer may submit written material to the Umpire relevant to the aforesaid determination by sending such material to:

Representation Fee Umpire
c/o Ohio Education Association
225 E. Broad Street
P.O. Box 2550
Columbus, Ohio 43216

The material will be timely if received by OEA prior to November 1, 1983.

(e) The Umpire will submit a written report to OEA which sets forth the percentage called for in paragraph (b) above and explains how it was determined.

(5) The procedure set forth in Section 4 above will be followed by NEA in order to determine the percentage of its total expenditures for the 1982–83 membership year that was expended for purposes not related to collective bargaining, contract administration and grievance processing, provided that dissenting fee payers who desire to submit written material to the Umpire will send such material to:

Representation Fee Umpire
c/o Ohio Education Association
225 E. Broad Street
P.O. Box 2550
Columbus, Ohio 43216

The reports of both the OEA and NEA Umpires are referred to hereinafter collectively as the "Umpire's Report."

(6) The "Final Refund," will be determined by applying

(a) the percentages called for in Sections (4) and (5) above for OEA and NEA to the portions of said fees paid to OEA and NEA, respectively, and

(b) the percentage called for in Section (4) for OEA to the portion of said fees paid to the relevant local affiliate and the appropriate OEA District Association.[1]

(7)(a) As soon as possible after the end of the 1982–83 membership year, but in no event later than December 31, 1983,[2] OEA will send to a dissenting fee payer a check for the amount of the Final Refund appropriate for his or her bargaining unit,[3] plus interest on such amount, and a notice informing him or her how the refund was calculated, together with a copy of the Umpire's Report.

(b) The Final Refund will be paid from the dissenting fee payer's escrow account, and any money remaining in said account(s) after such payment will be distributed as may be appropriate among NEA, OEA, appropriate OEA District Association and/or the relevant local affiliate.

B. *Agency Shop Fees Paid for Membership Years Subsequent to the 1982–83 Membership Year*

(1) The procedure set forth in Section A(1) above for filing an objection notice for the 1982–83 membership year will apply for subsequent membership years.

(2) Within ten (10) business days after the objection notice is received by OEA, OEA will:

---

1. Over 500 local associations and nine (9) District Associations are affiliated with OEA, and an analysis of individual budgets would entail excessive delay, expense, and burden. Since it generally is conceded that local and District Associations expend *at least* as much, and probably more, of their budgets for permissible purposes as defined in this procedure, across-the-board use of the OEA percentage would appear to provide the dissenting fee payers with adequate protection.

2. This has been selected as the deadline date because OEA and NEA could not provide the Umpire with an audited statement of actual expenses for the 1982–83 membership year until approximately December 1, 1983.

3. A dissenting fee payer who pays a fee for less than an entire year will receive a proportionately reduced Final Refund. Likewise should the agency fee established in a particular bargaining unit be less than 100% of the annual United Teaching Profession dues, UniServ service fee and assessments of the members of the affiliate representing the bargaining unit, and dissenting fee payer shall receive a proportionately reduced Final Refund.

(a) Determine a "Preliminary Refund," which will be calculated by

(i) applying the percentages used to determine the Final Refund for the preceding membership year to the membership dues for the membership year in question,[4] and

(ii) adding five (5) percent of said dues as a "cushion."

(b) Establish at a bank in Columbus, Ohio, a flat-rate interest-bearing escrow account and deposit in said account an amount that reflects the relationship that the portion of the agency shop fee that the local affiliate has received and forwarded to OEA up to and including that date it received the objection notice bears to the Preliminary Refund; and send the dissenting fee payer a notice informing him or her:

(i) of the amount of the refund that a preliminary determination indicates he or she is entitled to receive for the membership year in question, and that this amount will be deposited in a flat-rate interest-bearing escrow account in a bank in Columbus, Ohio.

(ii) of the basis for this determination, together with a copy of the budgets of NEA, OEA, the appropriate OEA District Association, and the relevant local affiliate for the membership year in question; and

(iii) that a further communication regarding the amount of his or her refund will be sent after the end of the membership year in question.

(3) OEA will deposit in the aforesaid escrow account the appropriate portion of the agency shop fee that the local affiliate receives and forwards to OEA subsequent to the date it received the objection notice, said deposits to be made within ten (10) days after receipt of the money.

(4) After the end of the membership year in question, the procedure set forth in Sections A(4) through (7) above regard-ing Final Refunds for the 1982–83 membership year will be followed, provided that:

(a) references to dates in 1982 and 1983 will refer to the same dates in the years in question; and

(b) if the amount in the escrow account is insufficient to pay the full amount of the Final Refund, including interest, to which he or she is entitled, the money required for this purpose will be paid from the treasury funds of OEA which shall recover appropriate prorated amounts from the NEA, District Association, and the relevant local affiliate.

(Policy 200.06)

March 1983

### APPENDIX 2

### FAIR SHARE FEE REBATE PROCEDURE

The Ohio Education Association, hereinafter referred to as the Association, on behalf of itself and its affiliated national, district, and local associations herewith establishes the following procedure relative to advance reductions/rebates of fair share fees collected in Ohio by the Association and its affiliates in order to comply with the Constitutional and state statutory standards established by *Abood v. Detroit Board of Education, Ellis v. Railway Clerks,* and *Hudson v. Chicago Teachers Union,* and Section 4117.09 of the Ohio Revised Code. Fair share fee payors who file written objections with the Association as hereafter provided shall be entitled to pay a reduced amount as the fair share fee. Fair share fee payors who do not file written objections as provided herein will be required to pay the full amount of the fair share fee as specified by the appropriate collective bargaining agreement. This procedure will be reviewed periodically and revised as necessary to reflect legal developments in this area.

**4.** If agency shop fees are received by a local affiliate before these percentages have been determined (see, December 31 deadline date in Section A(7)(a) above), OEA will escrow 100% of said fees received by it from the local affiliate, and make appropriate adjustments in the escrow accounts after the determinations have been made.

I. *Definitions*—For the purpose of this procedure:

A. *Association Activities* means those activities engaged in by the local association that is recognized as the exclusive bargaining agent and by its affiliated district association and its affiliated parent organizations, the Ohio Education Association and the National Education Association.

B. *Escrow Agent* means the bank, savings and loan association, other financial institution, or a real estate title insurance company having escrow powers which is located in Franklin County, Ohio and is selected by the Association to receive, hold, and disburse fair share fee monies collected from objecting fee payors.

C. *Fair Share Fee* means the annual fee that an employee in a fair share fee bargaining unit who does not become a voluntary unified member is required to pay to support his/her per capita share of the cost of Association activities.

D. *Fair Share Fee Payor* means all persons in an affiliated local association fair share fee bargaining unit who have not, as of November 1st of each membership year, voluntarily enrolled as unified members of the Association.

E. *Impermissible Expenditures* means those expenditures of an employee organization for Association activities which are in support of partisan political and ideological causes not germane to the work of the employee organization in the realm of collective bargaining. Impermissible expenditures also include those Association activities and expenditures which are classified as member-only benefits (e.g., interest free loans to members only and guaranteed insurance benefits to members only) by Association Executive Committee policy. In determining whether an expenditure is an impermissible expenditure, the Association shall apply the decisional law of the United States Supreme Court, the United States Sixth Circuit Court of Appeals, and

the Federal district courts sitting in Ohio as to those categories or classification of expenditures for which an advance reduction or rebate is constitutionally required and also apply all decisional law of SERB.

F. *Membership Year* means the Association's fiscal and membership year which commences September 1st annually and ends August 31st annually.

G. *Objecting Fee Payor* means a fair share fee payor who objects in writing to the expenditure of his/her fair share fee for impermissible expenditures.

H. *SERB* means the State Employment Relations Board established by Chapter 4117. of the Ohio Revised Code.

I. *Unified Dues* means the dues that an employee in the fair share fee bargaining unit in the relevant job category (e.g., full-time teacher, full-time school support personnel member, etc.) is required to pay in order to be a unified member of the Association during the current membership year.

J. *Unified Member* means those persons who have voluntarily enrolled as a member of the United Education Profession.

II. *Annual Determination of the Amount of the Fair Share Fee*

Not later than the 15th day of November annually the Association shall determine the total amount of Association impermissible expenditures for the preceding membership year and calculate the percentage which the total Association impermissible expenditures for the preceding membership year bears to the total expenditures for Association activities for the preceding membership year.

The Association's percentage of impermissible expenditures for the preceding membership year so determined shall be applied to the current membership year unified dues for membership in the state, district and local[1] associations to arrive at

---

1. Over 500 local associations and nine (9) district associations are affiliated with OEA, and an analysis of each individual budget would entail excessive delay, expense, and burden.

The Association has, and will continue to, periodically review the expenditures of selected district and fair share fee local associations. These reviews have clearly established that local and

the OEA, district, and local rebateable portion of the fair share fee.

The National Education Association shall provide the Association with its calculation of the amount or percent of the NEA rebateable portion of the fair share fee.

The amount of the rebateable portion of the NEA fair share fee plus the amount of the rebateable portion of the OEA, district, and local fair share fee constitutes the "fair share fee rebate."

The Association–Determined fair share fee for the fair share fee bargaining unit shall be the amount of the current membership year unified dues for the fair share fee payor if he/she had elected to become a unified member of the bargaining unit minus, in the case of objecting fee payors, the fair share fee rebate.

### III. Annual Notice to Fair Share Fee Payors

Upon receipt of: i) the independent certified public accountant's audit report of the Association's financial records for the preceding membership year, and ii) an independent certified public accountant's report of the NEA expenditures for the preceding membership year, or November 15th, whichever is later, the Association shall annually notify each fair share fee payor for the current membership year by first class mail at his/her home address as disclosed by bargaining unit or employer records, of the amount of the Association–Determined fair share fee for the current membership year, and an explanation of how it was calculated, and include copies of the NEA, the Association, and the appropriate district association (if available) audited reports for the preceding membership year, copies of the adopted budgets of the

district associations expend significantly less, as a percentage of their budgets, for impermissible expenditures than does the Association. This application of the Association's percentage of impermissible expenditures to the district and local portions of the fair share fee provides objecting fee payors with adequate protection of their Constitutional and state statutory rights and has been upheld by the federal district courts in other jurisdictions.

NEA, the Association, the appropriate district association and the local association which is the exclusive bargaining agent for the current membership year, and a copy of this Administrative Procedure.[2] The notice shall advise each fair share fee payor of his/her right to file a written objection notice with the Association objecting to the alleged expenditures of said fee for impermissible expenditures, and his/her obligation to pay the full amount of the bargained fair share fee if he/she does not file a timely written objection notice. The objection notice shall be mailed to the Ohio Education Association, P.O. Box 2550, 225 East Broad Street, Columbus, Ohio 43216 or delivered to the Association at the street address stated above. The objection notice may be phrased in general terms (i.e., an objection to the expenditures of the fee for impermissible expenditures) and need not identify or challenge specific expenditures. The objection notice must include the following:

a) the fair share fee payor's—
 i. name
 ii. home address
 iii. social security number
 iv. employing school district

b) a statement indicating whether the fair share fee payor
 i. accepts the Association–Determined fair share fee rebate, waives his/her right to have the amount of the rebate promptly determined by an impartial decisionmaker, and demands the immediate payment of the Association–Determined rebate or words to that effect (Category I objecting fee payor) or
 ii. challenges the amount of the Association–Determined rebate and demands that all of his/her fair share

2. In the case of a person who is employed subsequent to the commencement of the membership year, and who therefore does not receive the notice as provided herein, the Association upon knowledge of the person's fair share fee payor status shall give such notice. If a timely Category II objection notice is received from such person subsequent to the SERB determination of the fair share fee, the Association shall dispense with the escrow and pay the SERB-determined rebate directly to the person.

fees received by the Association be placed in escrow pending a prompt determination of the amount of the rebate by an impartial decisionmaker or words to that effect (Category II objecting fee payor).

The objecting fee payor may meet the requirements of this clause b) by stating that he/she wishes to be treated as either (but not both) a "Category I objecting fee payor" or as a "Category II objecting fee payor", as the case may be. However, if an objection notice does not clearly express the preference, the Association shall treat the objection notice as a Category I objection notice and an immediate Association–Determined rebate shall be paid.

The notice to the fair share fee payor shall also specify a determination date which shall not be earlier than the actual date of mailing of the notice and the determination date shall be used and applied by the Association for i) determining the timeliness of all objection notices received by the Association requesting rebates (both Category I and Category II objecting fee payors), and ii) determining the timeliness of petitions filed with SERB challenging the amount of the rebate.

A Category II objecting fee payor who wishes to be involved in the SERB proceeding as a party to the challenge of the amount of the Association–Determined fair share fee must also file a timely petition with SERB (see O.R.C. Section 4117.09(C) and SERB Rule 4117–11–01).

Objection notices requesting immediate payment of the Association–Determined rebate (Category I objection notices) or challenging the amount of the Association–Determined rebate (Category II objection notices) will be timely if postmarked or otherwise received by the Association within thirty (30) days of the determination date. A petition filed with SERB to challenge the amount of the rebate will be timely if filed with SERB within thirty (30) days of the

determination date (see O.R.C. Section 4117.09(C) and SERB Rule 4117–11–01).

An objection notice is only valid for the membership year to which it relates and there is no presumption that an objecting fee payor in one membership year continues to be an objecting fee payor in any other membership year.

*IV. Payment of the Rebate*

A. If the objecting fee payor files a Category I objection notice which constitutes a waiver of the fee payor's right to challenge the amount of the Association–Determined rebate and requests immediate payment of the rebate and the fair share fee payor has not also filed a challenge to the amount of the rebate with SERB, the Association shall mail, by first class mail, the Association–Determined rebate to the fair share fee payor.[3]

B. If the objecting fee payor files a Category II objection notice to challenge the amount of the Association–Determined rebate (or the objecting fee payor has also filed a challenge to the amount of the rebate with SERB), the Association shall, within ten (10) business days after receipt of the objection notice (or notice of the SERB filing) deposit 100% of the amount that is received by the Association with respect to the Category II objecting fee payor up to and including the date the Association received the Category II objection notice with the Escrow Agent. In addition, the Association will deposit with the Escrow Agent 100% of the fair share fee that the Association receives subsequent to the date it received the Category II objection notice, said deposits to be made within ten (10) business days after receipt of the money.

The funds received by the Escrow Agent for the escrow account shall be held in a flat-rate interest-bearing account. The escrow agreement with the Escrow Agent shall provide that i) the funds held in escrow with respect to a specific membership

---

**3.** An objecting fee payor who pays a fair share fee for less than the entire membership year will receive a proportionately reduced rebate. Likewise, should the fair share fee established for a particular bargaining unit be less than 100% of the unified dues, the objecting fee payor shall receive a proportionately reduced rebate.

year shall not be commingled with funds now or hereafter received by the Escrow Agent with respect to any other membership year, and ii) the funds in the escrow account with respect to a membership year shall be distributed, plus accrued interest, only in accordance with the decision of SERB with respect to the amount of the fair share fee rebate for the membership year under consideration pursuant to Section V below.

### V. Implementation of the SERB Decision

A. The amount of the fair share fee that SERB determines may be charged to a Category II objecting fee payor shall be referred to hereinafter as the "Impartially–Determined Fair Share Fee." Upon receipt of the SERB decision of the Impartially–Determined Fair Share Fee, the Association shall cause the Escrow Agent to disburse any money, including interest, that may be in the escrow account in accordance with the SERB decision. If the Impartially–Determined Fair Share Fee is less than the Association–Determined fair share fee, then the Association shall reduce appropriately the amount paid by all Category II objecting fee payors whose fair share fees are held by the Escrow Agent as hereinafter provided. If the Category II objecting fee payor is paying the fair share fee by payroll deduction, the Association may, at its option, arrange for the employer to adjust the amount of future fair share fee payroll deductions or refund the excess amount included in each deduction promptly after the Association receives said deduction from the employer, or pay to such Category II objecting fee payor in a single lump sum the total excess amount that shall be deducted for the remainder of the current membership year.[4]

B. The fact that the Category II objecting fee payor or the Association has challenged the amount of the Impartially–Determined Fair Share Fee in Court or in any other forum shall not preclude the Association and/or the Escrow Agent from taking the actions set forth in this Section.

4. See note 3, supra.

### VI. Appeals from the SERB Decision

The Association reserves the right to appeal the SERB decision, but only as to issues of the classification or categories of Association expenditures which the United States Constitution or the Ohio Revised Code require the Association to provide an advance reduction or a rebate, but such appeal, if successful, shall not operate to increase the Impartially–Determined Fair Share Fee for the membership year in dispute.